## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF REVERE, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AIP, LLC, AMERICAN INDUSTRIAL PARTNERS CAPITAL FUND IV, LP, AMERICAN INDUSTRIAL PARTNERS CAPITAL FUND IV (PARALLEL), LP, AIP/CHC HOLDINGS, LLC, OSHKOSH CORPORATION, PIERCE MANUFACTURING, INC., REV GROUP, INC., ROSENBAUER AMERICA LLC, FIRE APPARATUS MANUFACTURERS' ASSOCIATION,<br><br>Defendants. | Docket No.<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, the City of Revere, on behalf of itself and all others similarly situated, brings this class action against Defendants for violations of Section 1 of the Sherman Act and Section 7 of the Clayton Act. Plaintiff seeks an injunction against Defendants to cease all further anticompetitive practices as well as damages to the full extent authorized by law. Plaintiff demands a trial by jury.

## INTRODUCTION

1.     The nation's bravest need fire trucks to combat fires and protect life and property. Yet soaring prices and a severe backlog in fire truck manufacturing have constrained firefighters' ability to carry out their essential mission. From the mid-2010s to now, the price of fire trucks more than doubled and the delivery time almost tripled. Neither market principles nor inflation explain these drastic changes.

2.      Without the timely, affordable supply of new fire trucks, firefighters have had no choice but to continue using old fire trucks beyond their recommended life cycle. Fire trucks more than 30 years old are currently being used on the front lines, adding serious safety concerns for firefighters and the communities they protect.

3.      Beyond relying on old fire trucks, many fire departments have faced fire truck shortages that have hindered their ability to fight fires in their communities. In January 2025, for example, wildfires raged through Los Angeles, destroying entire neighborhoods and leading to hundreds of deaths. At the time the fires broke out, 100 of the 183 fire trucks owned by the Los Angeles Fire Department were out of service.

4.      A New York-based private equity firm called American Industrial Partners founded and controlled REV Group, the largest fire truck manufacturer in the United States. Since entering the fire truck manufacturing industry, AIP executed a series of acquisitions to consolidate the market and entrench REV Group's position as a dominant firm. As a result of AIP's roll-up strategy,[1] the fire truck manufacturing industry is no longer a competitive market.

5.      To take further advantage of the market, REV Group also conspired with two leading fire truck manufacturers, Oshkosh Corporation and Rosenbauer America LLC, to hike prices and restrict the supply of fire trucks. These three companies conspired in part through the Fire Apparatus Manufacturers' Association, which enabled fire truck manufacturers to collude and exchange confidential trade data.

6.      Industry consolidation and collusion across competitors have worked hand in hand. Oshkosh's CEO explained this synergy, noting: "We're certainly glad to see more companies consolidating especially publicly traded companies. We think that will help drive better discipline from a pricing standpoint in the market."

---

[1] Serial acquisitions are often favored by private equity firms, who "execute 'buy-and-build' strategies through a portfolio company that buys a firm, often the market leader, and 'rolls-up' smaller competitors using the private equity firm's money and acquisition expertise." Serial Acquisitions and Industry Roll-ups – Note by the United States, OECD, 3 (Dec. 4, 2023), https://one.oecd.org/document/DAF/COMP/WD(2023)99/en/pdf. (Last visited Nov. 18, 2025).

7.      Together, REV Group, Oshkosh, and Rosenbauer control about 80 percent of the U.S. fire truck market. By collaborating instead of competing with each other, these three companies have been able to enjoy an unprecedented boost in profit margins and reinforce their control over the market, while causing a dangerous shortage of fire trucks nationwide.

8.      These skyrocketing prices and fire truck shortages are not the results of a natural market.  Rather, as fire chiefs across the country have explained, they are the result of "corporate greed."[2] REV Group's former chief executive officer put it simply: "I should also clarify that, in my entire career, it's always been about making money, which in turn directly impacts shareholder value." "You should know," he continued, "that at REV, it's all about making money."[3]

9.      In response to the fire apparatus crisis, a bipartisan group of lawmakers have recently sought information from fire truck manufacturers concerning potential antitrust violations.[4] The Federal Trade Commission has also launched an investigation, according to REV Group and Pierce.[5]

---

[2] Mike Baker, *Firefighters Condemn "Greed" as Fire Engine Prices Soar*, N.Y. Times (Sept. 10, 2025), https://www.nytimes.com/2025/09/10/us/fire-trucks-manufacturers-costs-congress.html (Last visited Nov. 18, 2025).

[3] REV Group Inc. Q4 Earnings Call Transcript (2017), https://www.fool.com/earnings/call-transcripts/2017/12/21/rev-group-inc-revg-q4-2017-earnings-conference-cal.aspx. (Last visited Nov. 18, 2025).

[4] Press Release, Sen. Jim Banks, *Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing* (Apr. 15, 2025), https://www.banks.senate.gov/news/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing/ (last visited Nov. 18, 2025); Press Release, Sen. Josh Hawley, *Hawley, Kim Demand Answers from Major Companies after Backlog, Soaring Prices Hamper Fire Department Readiness* (Apr. 3, 2025), https://www.hawley.senate.gov/hawley-kim-demand-answers-from-major-companies-after-backlog-soaring-prices-hamper-fire-department-readiness/ (last visited Nov. 18, 2025).

[5] *Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt., D.C. & Census of the S. Comm. on Homeland Sec. & Gov't Affs*, 119th Cong. (2025), https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/ (last visited Nov. 18, 2025).

## JURISDICTION AND VENUE

10.     Plaintiff brings this action on its own behalf as well as that of the Class to recover damages, costs of suit, and reasonable attorneys' fees, arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 7 of the Clayton Act (15 U.S.C. § 18), as well as any and all equitable relief afforded under Section 16 of the Clayton Act (15 U.S.C. § 26) and other applicable federal laws pleaded herein.

11.     Jurisdiction and venue are proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and a substantial portion of the affected interstate trade and commerce was carried out in this District. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and has had the intended effect of, causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

### I.  Plaintiff City of Revere

12.     The City of Revere ("Revere") is a city located in Suffolk County, Massachusetts, directly bordering the city of Boston, with a population of roughly 62,000. The City has its own fire department with approximately 118 firefighters. The fire department has five fire stations, five engines ("pumpers"), and two ladder trucks. They respond to approximately 12,000 incidents annually. They have faced challenges maintaining a modern fire apparatus fleet to meet the fire protection needs of the city and its residents.

13.     In April 2021, Plaintiff Revere purchased two new E-One (REV Group) custom pumper fire trucks for over a million dollars. In November 2018, Plaintiff Revere directly purchased a new custom ladder truck from Kovatch Mobile Equipment Corporation ("KME"), a

4

subsidiary of Defendant REV Group for over one million dollars. As part of that sale, Plaintiff Revere directly contracted with KME (REV Group) for the purchase and warranty of the fire truck. The contract required Plaintiff Revere to "pay to [KME] . . . the Purchase Price" of the truck. Plaintiff Revere was injured in connection with its purchases during the Class Period as a result of Defendants' anticompetitive and unlawful agreements alleged herein.

## II. Defendants

### A. REV Group, Inc.

14.     Defendant REV Group, Inc. ("REV Group") is a Delaware corporation with its principal place of business in Brookfield, Wisconsin.[6]

15.     REV Group is the largest manufacturer of fire apparatus in the United States by unit volume, operating through a portfolio of well-known brands including E-ONE, Inc. ("E-ONE"), Kovatch Mobile Equipment Corporation ("KME"), Ferrara Fire Apparatus ("Ferrara"), Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively, "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower").[7]

16.     REV Group sells fire trucks from these brands across all 50 states through 113 dealers.[8] REV Group also sells Spartan cabs and chassis to around 40 smaller manufacturers.[9]

---

[6] Rev Group Form 10-K 2024 at 16 https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm (last visited Nov. 18, 2025).

[7] *See id.* at 5, 9, 14, 19, 35, 55; *see also REV Group Invests in Its Ephrata Facility to Increase Aerial and TDA Apparatus Production*, fireapparatusmagazine.com (Feb. 28, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-its-ephrata-facility-to-increase-aerial-and-tda-apparatus-production (last visited Nov. 18, 2025).

[8] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, Fireapparatusmagazine.com (July 1, 2020) https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Nov. 18, 2024).

[9] *Id.*

17.    REV Group operates manufacturing plants in Ocala, Florida, where it produces E-ONE apparatus; Hamburg, New York, where it produces stainless steel E-ONE products; Nesquehoning, Pennsylvania, which focuses on KME apparatus; Ephrata, Pennsylvania, where Ladder Tower, KME, and Ferrara apparatus are built; Brandon, South Dakota, which makes Spartan pumpers; Charlotte, Michigan, where it manufactures Spartan cabs and chassis; Snyder, Nebraska, where Smeal apparatus are produced; and Holden, Louisiana, which manufactures Ferrara apparatus.[10]

18.    Since its founding—as Allied Specialty Vehicles, Inc.—REV Group has pursued an aggressive acquisition strategy, consolidating numerous formerly independent fire apparatus manufacturers into a single corporate group.[11] As of March 2025, REV Group and its subsidiaries account for approximately 33% of U.S. fire apparatus sales, making it the dominant supplier in the market.[12] From 2006 to 2024, REV Group was controlled, directly or indirectly, by AIP, LLC and its affiliated funds, which exercised substantial influence over its operations, strategy, and board composition.[13]

---

[10] *Who We Are*, REV Group, https://revgroup.com/who-we-are (last visited Nov. 18, 2025).

[11] Letter from Senator Elizabeth Warren and Senator Jim Banks to Edward Kelly, General President, International Association of Fire Fighters (Apr. 15, 2025), https://www.warren.senate.gov/imo/media/doc/_firefighters.pdf (last visited Nov. 18, 2025) ("Warren Letter").

[12] American Economic Liberties Project Letter (May 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Nov. 18, 2025); Alta Fox Presentation (May 3, 2024), https://static1.squarespace.com/static/5aaacb57506fbe4636414126/t/6638598f84296766c804bd80/1714968976227/Alta+Fox+REVG+Presentation+Final_wv.pdf (last visited Nov. 18, 2025).

[13] Warren Letter (Apr. 15, 2025) at 1; REV Group Form 10-K 2023, https://www.sec.gov/Archives/edgar/data/1687221/000095017023069876/revg-20231031.htm at 31 (last visited Nov. 18, 2025); American Industrial Partners, Portfolio, REV, https://americanindustrial.com/project/rev-2/ (last visited Nov. 18, 2025).

### B.  American Industrial Partners

19.      Defendant AIP, LLC d/b/a American Industrial Partners ("AIP" or "American Industrial Partners") is a Delaware limited liability company with its principal place of business in New York, New York.[14]

20.      Founded in 2005, AIP is a private equity firm with more than $16 billion of cumulative capital raised since its inception.[15] AIP typically acquires ownership interests in established businesses with sales greater than $500 million and enterprise values up to $2 billion. Companies in which AIP acquires an ownership stake are referred to as "portfolio companies."

21.      Far from being a passive capital investor, AIP describes itself as "operationally-minded" and emphasizes its collaborative, hands-on involvement in the businesses it acquires. AIP's targets include privately held companies with leading market positions and value creation opportunities through M&A and industry consolidation.

22.      From 2006 to March 2024, AIP controlled REV Group. To carry out its "operationally-minded" involvement in the business affairs of REV Group, and in its direction and furtherance of the anticompetitive exclusionary scheme, AIP used a complex maze of related AIP entities, including investment funds which operate as limited partnerships. Currently, through a related holding company, AIP continues to possess a beneficial interest in REV Group.[16]

---

[14] AIP LLC Form ADV (Mar. 31, 2025), https://reports.adviserinfo.sec.gov/reports/ADV/156878/PDF/156878.pdf (last visited Nov. 19, 2025).

[15] AIP LLC Part 2 Brochure (Mar. 31, 2025), https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=968199 (last visited Nov. 19, 2025); American Industrial Partners, About AIP, https://americanindustrial.com/about/#:~:text=OUR%20CAPITAL%20BASE,funds%20and%20in%20every%20transaction (last visited Nov. 18, 2025).

[16] Investing.com, Rev group sees $127.6 million in stock sold by American Industrial Partners (Mar. 15, 2024), https://www.investing.com/news/stock-market-news/rev-group-sees-1276-million-in-stock-sold-by-american-industrial-partners-93CH-3340665 (last visited Nov. 18, 2025).

23.    Defendant American Industrial Partners Capital Fund IV, LP ("AIP Fund IV") is a Delaware limited partnership with its principal place of business in New York, New York.[17] AIP Fund IV held an ownership interest in REV Group from 2006 to March 2024.[18]

24.    Defendant American Industrial Partners Capital Fund IV (Parallel), LP ("AIP Parallel Fund") is a Delaware limited partnership with its principal place of business in New York, New York.[19] AIP Parallel Fund held an ownership interest in REV Group during the relevant period, through 2024.[20]

25.    Defendant AIP/CHC Holdings, LLC ("AIP Holdings" and together with the AIP Fund IV and AIP Parallel Fund, the "AIP Funds") is a Delaware limited liability company with its principal place of business in New York, New York.[21] AIP Holdings has held an ownership interest in REV Group since 2006.[22]

26.    At all relevant times, AIP exercised control over the AIP Funds and their affiliates through interlocking directors, officers, and principals, including but not limited to John Becker, Dino Cusumano, Kim Marvin, Paul Bamatter, Graham Sullivan, Donn Viola, and Stanley

---

[17] AIP LLC Form ADV (Mar. 31, 2025), *supra* note 14.

[18] American Industrial Partners, Portfolio, REV, https://americanindustrial.com/project/rev-2/ (last visited Nov. 18, 2025); *REV Group Sees $127.6 million in Stock Sold by American Industrial Partners*, Investing.com (Mar. 15, 2024), https://www.investing.com/news/stock-market-news/rev-group-sees-1276-million-in-stock-sold-by-american-industrial-partners-93CH-3340665 (last visited Nov. 18, 2025).

[19] AIP LLC Form ADV (Mar. 31, 2025), *supra* note 14; AIP Fund IV, SEC Form 4 (Feb. 20, 2024), https://www.sec.gov/Archives/edgar/data/1390368/000095010324002438/xslF345X05/dp207040_4-aipcf4lp.xml (last visited Nov. 19, 2025).

[20] *See, e.g.*, REV Group Form 10-K 2023, https://www.sec.gov/Archives/edgar/data/1687221/000095017023069876/revg-20231031.htm (last visited Nov. 18, 2025); REV Group Form 10-K 2024, https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm (last visited Nov. 18, 2025).

[21] AIP/CHC Holdings, LLC, Delaware Entity Details; AIP Fund IV, SEC Form 4, *supra* note 19.

[22] *See supra* note 20.

Edme.[23] These individuals were actively involved in the management and operations of REV Group, including through service on its Board of Directors.[24]

27.     AIP focuses on acquiring industrial businesses and has developed expertise in their management. AIP acquired REV Group's predecessor company in 2008, and maintained control over REV Group through its related funds and entities until 2024.

28.     From 2006 to 2024, the AIP Defendants directed or conspired with REV Group to acquire rival fire apparatus manufacturers throughout the United States. Acting in concert with one another, and with other members of AIP's exclusionary scheme, the AIP Defendants committed overt acts in furtherance of AIP's exclusionary scheme. AIP and the AIP Funds provided funding to enhance, extend, and ensure REV Group's market power and obtained financial rewards as a result.

29.     Since 2024, AIP has maintained a beneficial interest in REV Group through AIP Holdings and thus continues to derive a financial benefit from AIP's exclusionary scheme.

### C.  Oshkosh Corporation and Pierce Manufacturing, Inc.

30.     Defendant Oshkosh Corporation ("Oshkosh") is a Wisconsin corporation with its principal place of business in Oshkosh, Wisconsin.[25]

31.     Defendant Pierce Manufacturing Inc. ("Pierce Manufacturing") is a Wisconsin corporation with its principal place of business in Appleton, Wisconsin. Pierce Manufacturing is a wholly owned subsidiary of Oshkosh Corporation, serving as its primary operating entity in the

---

[23] For example, AIP CF IV, LLC is the general partner of both AIP Fund IV and AIP Parallel Fund. AIP/CHC Investors, LLC is the managing member of AIP Holdings. The same principals from AIP managed both AIP entities while also serving on the REV Group Board of Directors. *See* AIP Fund IV Form 3 (Jan. 26, 2017) at n.4, https://www.sec.gov/Archives/edgar/data/1390368/000095010317000660/xslF345X02/dp72214_3-aipcf.xml (last visited Nov. 18, 2025).

[24] *See id.*

[25] Oshkosh Corp. Form 10-K 2024, https://www.investors.oshkoshcorp.com/media/document/cdffc8d8-7620-48f8-9d1a-b5430d2b7d47/assets/2024_Oshkosh_Annual_Report_web.pdf (last visited Nov. 18, 2025).

fire apparatus market.[26] Pierce Manufacturing produces custom and commercial pumpers, aerials, rescue trucks, wildland trucks, mini pumpers, and other fire apparatus in its manufacturing facilities in Appleton, Wisconsin and Bradenton, Florida.[27] Pierce Manufacturing has pursued an aggressive acquisition strategy, consolidating numerous formerly independent fire apparatus manufacturers into a single corporate group. Pierce Manufacturing accounts for approximately 25% of fire apparatus sales in the United States.[28]

32.    Pierce Manufacturing has 26 dealers located in California, Colorado, Florida, Kansas, Massachusetts, Minnesota, Mississippi, New Jersey, New York, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin.[29] Through these dealers, Pierce Manufacturing sells fire trucks to customers nationwide, across all 50 states. Oshkosh and Pierce Manufacturing generate about $750 million in annual U.S. fire truck sales, representing approximately 25% of

---

[26] *Id.*

[27] *Pierce Manufacturing Joins Oshkosh Corporation to Showcase the Future of Electric Firefighting Technology at CES 2025*, Fireapparatusmagazine.com (Dec. 23, 2024), https://www.fireapparatusmagazine.com/industry-news/pierce-joins-oshkosh-to-showcase-the-future-of-electric-firefighting-technology-at-ces-2025 (last visited Nov. 18, 2025); *Tour of Pierce Manufacturing,* Inc., R4.IEEE.org, https://r4.ieee.org/event/tour-of-pierce-manufacturing-inc/ (last visited Nov. 18, 2025).

[28] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?* (Jan. 25, 2025), https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll (last visited Nov. 18, 2025).

[29] *Find a Dealer*, Piercemfg.com, https://www.piercemfg.com/find-a-dealer (last visited Nov. 18, 2025).

the market.[30] In the fourth quarter of 2024, Oshkosh reported a net income of $153.1 million,[31] while Pierce's annual revenue is estimated at around $1.3 billion.[32]

### D. Rosenbauer America LLC

33.     Defendant Rosenbauer America LLC ("Rosenbauer") is a Delaware limited liability company with its principal place of business in Lyons, South Dakota. Rosenbauer operates as a wholly owned subsidiary of Rosenbauer International AG, an Austrian company listed on the Vienna Stock Exchange.[33]

34.     Rosenbauer builds custom and commercial pumpers, heavy rescues, tenders, mini pumpers, light rescues, aerial ladders, platforms, and electric fire trucks out of manufacturing plants located in Lyons, South Dakota; Wyoming, Minnesota; and Fremont, Nebraska.[34] Rosenbauer sells fire trucks to customers across all 50 states, through a network of 24 dealers located in Alabama, Arizona, California, Colorado, Florida, Georgia, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, South Dakota, Texas, Utah, Washington, and West Virginia.[35] In the United States, Rosenbauer generates around $307 million in annual fire

---

[30] Musharbash, *supra* note 28.

[31] *Oshkosh Corporation Reports 2024 Fourth Quarter and Full Year Results*, Oshkoshcorp.com (Jan. 30, 2025), https://investors.oshkoshcorp.com/news/oshkosh-corporation-reports-2024-fourth-quarter-and-full-year-results/f1490807-bbcf-44b4-be51-56294a3276e3 (last visited Nov. 18, 2025).

[32] *Pierce Manufacturing Information*, RocketReach, https://rocketreach.co/pierce-manufacturing-profile_b5c68a33f42e0c9d#:~:text=Pierce%20Manufacturing%20is%20a%20Manufacturing%2C%20Motor%20Vehicle,company%20located%20in%20Appleton%2C%20Wisconsin%20with%20$1.3)  (last visited Nov. 18, 2025).

[33] *Rosenbauer.com,* https://www.rosenbauer.com/en/contact/locations/rbi (last visited Nov. 19, 2025); Rosenbauer, *Wikipedia*, https://en.wikipedia.org/wiki/Rosenbauer (last visited Nov. 19).

[34] *Vehicles*, Rosenbauer.com, https://www.rosenbauer.com/en-us/products/vehicles (last visited Nov. 18, 2025); *Rosenbauer America*, Rosenbauer.com, https://www.rosenbauer.com/en-us/contact/locations/america (last visited Nov. 18, 2025).

[35] *Contact*, Rosenbauer America, https://www.rosenbauer.com/en-us/contact/contact-partners (last visited Nov. 18, 2025).

apparatus sales,[36] representing approximately 10% of the market.[37]

35.    Hereinafter, Defendants REV Group, Oshkosh, and Rosenbauer are collectively referred to as Manufacturer Defendants.

### E. Fire Apparatus Manufacturers' Association

36.    Defendant Fire Apparatus Manufacturers' Association ("FAMA") is a nonprofit fire manufacturers' trade group located in Greenwell Springs, LA.[38] FAMA represents companies that produce fire apparatus. As of May 2025, FAMA had 55 manufacturer members,[39] including REV Group subsidiaries E-ONE, Ferrara, KME, and Spartan; Pierce Manufacturing; and Rosenbauer.[40] FAMA's Chairman is Paul Bostrom,[41]  President and CEO of H.O. Bostrom Company,[42] a fire and rescue seating manufacturer.[43] FAMA's Vice-Chair is John Schultz,[44] who

---

[36] *Rosenbauer International Fully Acquires Rosenbauer America*, Rosenbauer.com  (June 23, 2022), https://www.rosenbauer.com/en/company/investor-relations/financial-news/2022/06/rosenbauer-international-fully-acquires-rosenbauer-america (converted to U.S. dollars from 262.9 million euros) (last visited Nov. 18, 2025).

[37] Musharbash, *supra* note 28.

[38] FAMA website, https://www.fama.org/ (last visited Nov. 19, 2025).

[39] *FAMA Releases Fire Apparatus Industry Update*, fireengineering.com (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update/ (last visited Nov, 18, 2025).

[40] *Members List*, Fire Apparatus Mfrs. Ass'n (Mar. 27, 2025), https://web.archive.org/web/20250327160713/https://www.fama.org/members/list/ (last visited Nov. 18, 2025).

[41] *Data & Research Committee*, Fire Apparatus Mfrs. Ass'n,  https://www.fama.org/data-research-committee (last visited Nov. 18, 2025).

[42] Paul Bostrom, LinkedIn, https://www.linkedin.com/in/paul-bostrom-0934627 (last visited Nov. 18, 2025).

[43] H.O. Bostrom, https://hobostrom.com/fire-and-rescue (last visited Nov. 18, 2025).

[44] *Data & Research Committee*, Fire Apparatus Mfrs. Ass'n,  https://www.fama.org/data-research-committee (last visited Nov. 18, 2025).

is Pierce Manufacturing's Vice President and General Manager of Pumper Product.[45] FAMA acted as a co-conspirator of Manufacturer Defendants by enabling the sharing of confidential, proprietary, and competitively sensitive information among them.

### III.    Agents and Co-Conspirators

37.    "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly owned or controlled subsidiaries, affiliates, employees, officers, and directors.

38.    Whenever reference is made to any act, deed, or transaction of any corporation or partnership, the allegation means that the corporation or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parent, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

### CLASS ALLEGATIONS

39.    Plaintiff brings this action for damages and injunctive relief on behalf of itself and all others similarly situated as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Class:

> All entities, including local or municipal government entities, distributors, and buying groups, that directly purchased fire apparatus from Defendants REV Group, Inc., Pierce Manufacturing, Inc., or Rosenbauer America LLC in the United States from January 1, 2016 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

This definition specifically excludes the following persons or entities:

> a.    Any of the Defendants named herein;
>
> b.    Any of the Defendants' co-conspirators;

---

[45] *John Schultz*, Pierce Manufacturing, https://www.piercemfg.com/hubfs/FDIC%202025/Bios/Bio/John%20Schultz%20-%20Pierce%20Manufacturing.pdf (last visited Nov. 18, 2025).

  c. Any of Defendants' parent companies, subsidiaries, and affiliates;

  d. Any of Defendants' officers, directors, management, employees, subsidiaries, affiliates, or agents;

  e. All governmental entities; and

  f. The judges and chambers staff in this case, as well as any members of their immediate families.

 40. Plaintiff does not know the exact number of Class members, because such information is in the exclusive control of Defendants. Plaintiff is informed and believes that, due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed throughout the United States, such that joinder of all Class members in the prosecution of this action is impracticable.

 41. Plaintiff's claims are typical of the claims of its fellow Class members because Plaintiff and Class members directly purchased fire apparatus, including fire trucks, from Defendants REV Group, Inc., Oshkosh, and/or Rosenbauer America LLC, and their subsidiaries. Plaintiff and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

 42. Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

  a. Whether Defendants combined or conspired with one another to not compete in the market for fire apparatus, including fire trucks, sold at any time during the Class Period to purchasers in the United States;

  b. Whether Defendants combined or conspired with one another to fix, raise, maintain and/or stabilize prices for fire apparatus, including fire trucks, sold at any time during the Class Period to purchasers in the United States;

    c.   Whether Defendants combined or conspired with one another to divide or allocate the market for fire apparatus, including fire trucks, sold at any time during the Class Period to purchasers in the United States;

    d.   Whether Defendants' conduct caused the prices of fire apparatus, including fire trucks, sold at any time during the Class Period to purchasers in the United States to be artificially fixed, raised, maintained or stabilized at supracompetitive prices;

    e.   Whether Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the appropriate Class-wide measure of damages;

    f.   Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

43.    These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

44.    Plaintiff will fairly and adequately represent the interests of the Class because it purchased fire apparatus, including fire trucks directly from Defendant REV Group, Inc., and it has no conflicts with any other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who is experienced in prosecuting antitrust class actions, as well as other complex litigation.

45.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

46.    This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

47.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## FACTUAL ALLEGATIONS

### I.  Industry Background

48.     Fire trucks (commonly referred to in the industry as fire apparatus) are specialized emergency vehicles such as pumpers, aerial trucks, and rescue units that are designed for use by fire departments and emergency services.[46] The fire apparatus market is a critical sector of the national economy, providing municipalities, private contractors, and other entities with specialized vehicles and equipment to provide essential services such as fire suppression, emergency and rescue response, disaster relief, aircraft rescue, and firefighting.[47]

49.     The fire apparatus manufacturing industry in its modern form emerged in the aftermath of World War II. Numerous independent manufacturers across the nation started producing specialized vehicles for firefighting purposes. Competition among them was fierce. Fire truck prices were kept near cost-level and manufacturing capacity was sufficient to meet the market's demands.

50.     For several decades, this vibrant and competitive industry enjoyed relative stability under competitive conditions. Fire truck prices rose by about 3%, adjusted for inflation, annually. By 2008, about 5,000 new fire trucks were being sold in the United States each year.

51.     However, the industry grounded to a halt during the 2008 Financial Crisis. Local governments and other fire truck buyers saw their budgets slashed. This caused a temporary drop in demand for new fire trucks. By 2011, new fire truck sales had decreased more than 40% from its peak.

---

[46] Rev Group Form 10-K 2024.

[47] *See id.*

52.     The product life cycle for fire apparatus is characterized by long service durations and high capital costs. For example, pumper trucks (which carry water to pump into a fire) and aerial ladder trucks (trucks equipped with an extendable ladder) generally have useful lives of 10–12 years and 20–30 years, respectively.[48] Despite relatively low annual mileage, fire apparatus become technologically obsolete before they reach the end of their mechanical life, necessitating periodic fleet renewal to maintain operational readiness and compliance with evolving safety standards.[49]

53.     Over the past decade, fire apparatus prices have surged, with pumper trucks now often exceeding $1 million and ladder trucks often surpassing $2 million.[50] In 2013, a pumper truck cost $500,000, and a ladder truck cost $900,000. Today, the prices have skyrocketed to roughly $1 million and $2 million, respectively, far outpacing inflation for heavy duty truck manufacturing over that time period.[51]

---

[48] Rev Group Form 10-K 2017, https://www.sec.gov/Archives/edgar/data/1687221/000156459017025241/revg-10k_20171031.htm (last visited Nov. 18, 2025)

[49] *See id.*

[50] Patrick Varine, *Despite Grant, PA Dept. Says Rising Apparatus Costs a Challenge*, Firehouse (Aug. 3, 2023), https://www.firehouse.com/apparatus/news/53068052/despite-fire-act-grant-export-pa-fire-department-says-rising-fire-apparatus-costs-a-challenge (last visited Nov. 18, 2025); *City Council Approves Purchase of New Fire Ladder Truck and Police Squad Car*, Waupun Pioneer News (Jan. 22, 2025), https://waupunpioneer.com/2025/01/22/city-council-approves-purchase-of-new-fire-ladder-truck-and-police-squad-car/ (last visited Nov. 18, 2025).

[51] Warren Letter (Apr. 15, 2025) at 2.

54.     In addition to rising prices, manufacturers have maintained a growing backlog, leading to wait times that can now be as long as 4.5 years.[52] Since 2019, the lead times for fire truck delivery have increased from one year, to two, to four and one half years.[53]

55.     The fire apparatus industry is highly concentrated, with three manufacturers—REV Group, Oshkosh, and Rosenbauer America—collectively controlling approximately 70–80% of the market.[54] The remaining market share is fragmented among a small number of independent manufacturers, whose presence has steadily declined.[55]

## II. Defendants systematically rolled up the U.S. fire apparatus market through a series of acquisitions of competitors.

### A. AIP and REV Group

56.     AIP is a Wall Street-based private equity firm that specializes in the investment and management of industrial businesses. AIP has a specific approach to maximizing investment returns. First, AIP "pursues businesses that enjoy competitive positions, proprietary capabilities, and/or leading market shares." AIP looks to acquire "leaders in their industrial market niches," but have "unexploited opportunities." Second, AIP manages the acquired companies to "significantly increase" earnings by implementing what it calls an Operating Agenda. The Operating Agenda is a "detailed action plan" that AIP develops and implements "in partnership

---

[52] Rev Group Form 10-K 2024 at 40; Maria Serrano, *"We Saw this Coming": Here's How a Fire Chief Is Getting Ahead of a Nationwide Delay in Emergency Vehicle Production*, Spectrum News 23 (May 2, 2023), https://mynews13.com/fl/orlando/news/2023/04/27/production-shortages-causing-delay-in-fire-truck-delivery (last visited Nov. 18, 2025); David Kroman, *Firetruck Fleet Aging Faster Than Seattle Can Make Repairs*, GovTech Weekly (Apr. 2, 2024), https://www.govtech.com/em/disaster/firetruck-fleet-aging-faster-than-seattle-can-make-repairs (last visited Nov. 18, 2025); Bill Smith, Evanston Now, *Council OK's fire truck buy* (Mar. 26, 2024), https://evanstonnow.com/council-oks-fire-truck-buy/ (last visited Nov. 18, 2025).

[53] Warren Letter (Apr. 15, 2025) at 2.

[54] Letter from Senator Josh Hawley and Senator Andy Kim to Mark Skonieczny, John Pfeifer, and Rob Kreikemeier (Apr. 3, 2025), https://www.hawley.senate.gov/wp-content/uploads/2025/04/Hawley-Letter-to-Firetruck-Executives.pdf (last visited Nov. 18, 2025).

[55] Alta Fox Presentation (May 3, 2024) at 4.

with management." "Based on the experience of the AIP team," the Operating Agenda typically includes (among other things): "add-on acquisitions and divestitures," "operating expense rationalization," "lean manufacturing," "warranty cost reduction," and "aftermarket opportunities."[56] AIP runs an entire team "consist[ing] of engineers and operating executives in addition to financial professionals" to develop and execute the Operating Agenda.[57]

57.    In 2008, AIP took advantage of the disruption caused by the 2008 Financial Crisis to enter the fire apparatus manufacturing market.

58.    On August 5, 2008, AIP announced that it had entered the fire apparatus market through AIP Fund IV's direct acquisition of E-ONE, Inc. ("E-ONE") in a carveout transaction from Federal Signal Corporation. E-ONE, a leading fire apparatus manufacturer, became the foundation for AIP's planned roll-up of the Fire Apparatus Market. As described by an AIP managing partner at the time, E-ONE was "a premier brand name in the fire rescue market [which] has a tremendous franchise that we can build on."[58] E-ONE manufactured a complete range of fire apparatus, including brush trucks, pumpers, and aircraft rescue and firefighting vehicles.[59]

---

[56] *Investment Philosophy*, American Industrial Partners, https://americanindustrial.com/investment-philosophy/ (last visited Nov. 18, 2025).

[57] *Values*, American Industrial Partners, https://americanindustrial.com/about/values/ (last visited Nov. 18, 2025).

[58] American Industrial Partners, Acquisition of E-ONE, Inc., https://americanindustrial.com/american-industrial-partners-announces-acquisition-of-e-one-inc-a-subsidiary-of-federal-signal-corporation/ (last visited Nov. 18, 2025); Fire Wiki, E-One Inc., https://fire.fandom.com/wiki/E-One_Inc. (last visited Nov. 18, 2025).

[59] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, fireapparatusmagazine.com (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Nov. 18, 2025).

59.    On August 18, 2008, AIP closed its AIP Fund IV with committed capital in excess of its $405 million target.[60] The fund's limited partners included HSBC, Partners Group, FLAG Capital Management, Goldman Sachs, Grove Street Advisors, John Hancock Life Insurance Company, and Parish Capital.[61]

60.    On August 24, 2010, AIP announced the formation of Allied Specialty Vehicles, Inc. ("ASV") through the combination of E-ONE with three other portfolio companies.[62] With approximately $1 billion in combined revenue, ASV became an immediate market leader in specialty vehicles, including fire trucks.[63]

61.    On July 9, 2014, AIP offered Timothy M. Sullivan the role of CEO of ASV, describing a partnership that could create $800 million to $1 billion in shareholder value over a three-year period.[64] In its offer, AIP highlighted ASV's 14 manufacturing sites, $1.7 billion revenue—a 70 percent increase from just four years earlier—and market leading positions across multiple specialty vehicle categories, including fire and emergency.[65] AIP stated that Sullivan was "ideal to lead ASV as its end markets accelerate with the recovery of municipal and discretionary consumer spending and as we prepare for a public exit of a rapidly improving business." Among Sullivan's top priorities would be "[i]dentifying and assisting with the

---

[60]*AIP Closes $405 Million Fund*, American Industrial Partners (Aug. 18, 2008), https://americanindustrial.com/american-industrial-partners-closes-405-million-fund/ (last visited Nov. 18, 2025).

[61] *See id.*

[62] *AIP Announces the Formation of Allied Specialty Vehicles, Inc.*, American Industrial Partners (Aug. 24, 2010), https://americanindustrial.com/american-industrial-partners-announces-the-formation-of-allied-specialty-vehicles-inc-a-leading-manufacturer-of-specialty-vehicles-in-north-america/ (last visited Nov. 18, 2025).

[63] *See id.*

[64] Sullivan Offer Letter (Jul. 9, 2014), https://www.sec.gov/Archives/edgar/data/1687221/000119312516803229/d251368dex108.htm (last visited Nov. 18, 2025).

[65] *Id.*

purchase and integration of targeted acquisitions and preparing the [REV Group] for a highly successful public exit."[66]

62.    On November 1, 2015, ASV changed its name to REV Group, Inc. to signal the company's planned growth strategy.[67] As Sullivan explained, "Like a revving engine letting bystanders know a car is preparing for a quick acceleration, REV communicates to the world that we are set for growth."[68]

63.    After the rebranding, AIP accelerated its pace of rolling up fire truck manufacturers and consolidating the market.[69]

64.    In 2016, REV Group purchased Kovatch Mobile Equipment Corporation ("KME") based in Nesquehoning, Pennsylvania for $40 million. Founded in 1946 as a family business, KME had more than 800 associates and operated in Pennsylvania, Virginia, New York, and California. KME had an "extensive independent dealer network" and produced a broad array of fire apparatus, including pumpers, aerials, and tankers.[70]

65.    In 2017, REV Group purchased Ferrara Fire Apparatus, Inc. ("Ferrara"), another

---

[66] *Id.*

[67] *Allied Specialty Selects REV as New Company Name*, Fire Apparatus & Emergency Equipment (Nov. 2, 2015), https://www.fireapparatusmagazine.com/fire-apparatus/ambulances/allied-specialty-vehicles-selects-rev-as-new-company-name/ (last visited Nov. 18, 2025).

[68] *Id.*

[69] Mike Baker, Maureen Farrell & Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. Times (Feb. 17, 2025), https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html (last visited Nov. 18, 2025) (hereinafter "Baker, Farrell & Kovaleski").

[70] *REV Group Acquires Kovatch Mobile Equipment*, REV Group (Apr. 11, 2016), https://investors.revgroup.com/investor-releases/2016/11-04-2016 (last visited Nov. 18, 2025); Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, Fire Apparatus & Emergency Equipment (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Nov. 18, 2025); *KME Fire Apparatus Sold REV Group*, Firehouse (Apr. 11, 2016), https://www.firehouse.com/apparatus/press-release/12193362/fire-apparatus-manufacturer-kme-kovtach-pumpers-aerials-heavy-rescue-fire-apparatus-builder-kme-fire-apparatus-sold-to-revgroup/ (last visited Nov. 18, 2025).

family-owned business based in Holden, Louisiana, for $100 million. At the time, Ferrara had more than 450 employees and annual revenue of approximately $140 million.[71] Ferrara had been a key competitor of E-ONE in the southern United States.[72] In REV Group's own words, Ferrara was a "leading custom fire apparatus" manufacturer.[73] By acquiring Ferrara, REV Group enhanced its "geographic markets and its product offering, particularly with custom fire apparatus including pumpers, aerials, and industrial vehicles."

66. According to Dan Peters, president of REV Group's fire apparatus division, the addition of Ferrara "enable[d] a number of new growth opportunities including expansion of our reach nationwide and adding new geographical regions and key accounts."[74] REV Group CEO Timothy Sullivan stated that "Ferrara will immediately contribute strategic value by expanding the REV Fire Group national footprint, dealer sales network, service and after-market parts revenue as well as enhancing our robust line of custom chassis and aerial products for multiple market segments."[75] Explaining the significance of REV Group's acquisition of Ferrara, Sullivan

---

[71] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, fireapparatusmagazine.com (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/ (last visited Nov. 18, 2025).

[72] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, fireapparatusmagazine.com (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Nov. 18, 2025); *REV Group Acquires Ferrara Fire Apparatus, Inc.*, revgroup.com (Apr. 25, 2017), https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523 (last visited Nov. 18, 2025).

[73] REV Group, 10-K, 2017 at F-16, https://www.sec.gov/Archives/edgar/data/1687221/000156459017025241/revg-10k_20171031.htm (last visited Nov. 18, 2025).

[74] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, Fire Apparatus & Emergency Equipment (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/ (last visited Nov. 18, 2025).

[75] *Id.*

also said " We now have by far the largest portfolio of Fire Apparatus of any competitor in the United States, which means that we can effectively bid on everything that's out there."[76]

67.    At this point, REV Group wielded substantial market power. REV Group's subsidiaries included E-ONE, KME, and Ferrara, each a major fire apparatus brand in its own right. Yet AIP was not satisfied and continued to acquire fire apparatus manufacturers to further consolidate the market.

68.    In 2020, AIP-controlled REV Group purchased another fire truck manufacturer called Spartan Emergency Response—along with its affiliated brands Spartan Fire Apparatus and Chassis, Smeal Fire Apparatus, and Ladder Tower Company—for $55 million.[77] These brands had a significant presence in the Midwest market. The acquisition cemented REV Group as the top fire truck manufacturer in the country, with at least 30–40% of fire truck sales.

69.    AIP's serial acquisitions since 2008 substantially reduced competition in the fire truck manufacturing market and certified REV Group's position as a dominant fire truck manufacturer in the United States.

**TABLE 1. REV Group's Acquisitions of Fire Truck Manufacturers**

| Acquisition | Year | Value | Significance |
|---|---|---|---|
| E-ONE, Inc. | 2008 | $20M | • Third largest manufacturer at the time<br>• Set the base for horizontal roll-ups |
| Kovatch Mobile Equipment Corporation | 2009 | $40M | • Family-owned, founded in 1946<br>• Full fire apparatus product portfolio<br>• More than 800 employees |

---

[76] REV Group Inc. Q2 Earnings Call Transcript (2017), https://seekingalpha.com/article/4079627-rev-groups-revg-ceo-tim-sullivan-on-q2-2017-results-earnings-call-transcript. (last visited Nov. 14, 2025).

[77] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, Fire Apparatus & Emergency Equipment (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Nov. 18, 2025); *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*, REV Group (Feb. 3, 2020), https://investors.revgroup.com/investor-releases/2020/02-03-2020-135942281 (last visited Nov. 18, 2025).

| Ferrara Fire Apparatus, Inc. | 2017 | $100M | • Family-owned, founded in 1982[78]<br>• E-ONE's direct competitor<br>• More than 450 employees<br>• Allowed REV Group to cover the "entire map"[79] |
|---|---|---|---|
| Spartan Emergency Response | 2020 | $55M | • Over a century in the fire apparatus market[80]<br>• "[S]olidified REV as the number one player in the North American Fire & Emergency market"[81] |

**After rolling up competitors, AIP and REV Group implement strategies to leverage its renewed market power in a concentrated market.**

70.    Under AIP's direction and management, REV Group leveraged its increased market power to further reduce competition in the industry. The president of REV Group's fire division suggested that its acquired companies and their dealers would maintain their independence, stating that each brand "will remain autonomous and valued for their strategic and unique positions in the marketplace."[82] But at the same time, REV Group made clear that competition among subsidiaries that could diminish profit margins would not be tolerated.[83]

71.    Indeed, REV Group implemented a "platforming" strategy across its fire apparatus companies. The plan combined operations, standardized vehicle designs, and integrated

---

[78] *Ferrara Fire Apparatus*, Firefighting Wiki https://fire.fandom.com/wiki/Ferrara_Fire_Apparatus (last visited Nov. 18, 2025).

[79] REV Group Inc. Q2 Earnings Call Transcript (2017), https://seekingalpha.com/article/4079627-rev-groups-revg-ceo-tim-sullivan-on-q2-2017-results-earnings-call-transcript (last visited Nov. 14, 2025).

[80] Spartan ER, https://spartaner.com/about-us/ (last visited Nov. 18, 2025).

[81] REV Group Inc. Q1 Earnings Call Transcript (2020), https://www.fool.com/earnings/call-transcripts/2020/03/05/rev-group-inc-revg-q1-2020-earnings-call-transcrip.aspx (last visited Nov. 18, 2025).

[82] *REV Group Invests in the Strength of Fire Apparatus Brands*, Fire Apparatus & Emergency Equipment (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Nov. 18, 2025).

[83] Musharbash, *supra* note 28.

dealer networks.[84] REV Group's subsidiaries were made to "[c]onverge on common designs that can be shared across brands," and to adopt Spartan's Metro Star chassis/cab as the shared platform for multiple product offerings.[85] REV Group restructured dealer territories to avoid overlap and centralized operations to manage "margin improvement actions" across the board.[86]

72.    By 2021, REV Group was publicly referring to itself as "an industry consolidator."[87] Investor presentations highlighted the company's "history of consolidation," provided a timeline of acquisitions dating back to 2006, and cited "continued industry consolidation," "entrenched channel partners," and a record "$2.3B backlog" as indicators of strong financial performance.[88]

---

[84] REV Group, Investor & Analyst Day (Apr. 15, 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-investor-day-v18.pdf, at 27–32 (last visited Nov. 18, 2025).

[85] *REV Group, Investor & Analyst Day Presentation* (Apr. 15, 2021), https://www.sec.gov/Archives/edgar/data/1687221/000119312521117088/d152365dex991.htm (last visited Nov. 19, 2025).

[86] Musharbash, *supra* note 28.

[87] *REV Group, Inc. Presentation*, REV Group at 5 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Nov. 18, 2025).

[88] *Id*.



**IMAGE 1: REV Group, Inc., A History of Consolidation**[89]

73.    In communications with investors, REV Group stated that its objective was to double the profitability of its acquired fire apparatus manufacturers. REV Group CEO Timothy Sullivan told analysts that those companies were operating at profit margins of 4–5%, but that REV Group was on track "to get all of them above that 10 percent level." [90] As Sullivan put it: "You bring them into the fold, you got to give them the religion, and they've got it now."[91]



**IMAGE 2: Logos of fire apparatus brands consolidated by REV Group by 2020.**[92]

---

[89] *Id.* at 6.

[90] Baker, Farrell & Kovaleski, *supra* note 69.

[91] Baker, Farrell & Kovaleski, *supra* note 69.

[92] *REV Group, Inc. Presentation July 2021*, revgroup.com at 9, https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Nov. 18, 2025).

74.     AIP and REV Group's roll-up of fire manufacturers had the effect of substantially reducing competition in the fire truck manufacturing industry, harming consumers and public safety. In the absence of competition, fire truck prices have skyrocketed and backlogs have ballooned. These rising prices and supply restrictions cannot be explained by market forces such as a demand, inflation, supply constraints, or other market dynamics.[93]

75.     Gil Carpenter, a fire chief in Benton, Arkansas, explains how it used to be easy to order parts for fire trucks. In the past, he would simply call a contact named Charlie, who would ship it to him the next day. But since Ferrera was acquired by REV Group, it now takes more than 10 months for an order of new parts to be fulfilled. Because of these delays, Carpenter's fire department could not use one of its eight fire trucks for close to a year.[94]

76.     According to analysis, REV Group currently controls about 33% of the fire truck market, but its actual market power and ability to control outout is higher. This is because smaller manfacturers rely on REV Group to buy the body of the vehicles or other parts, effectively being subject to REV Group's control. In other words, REV Group produces certain fire truck parts, including chassis (the structural base underlying fire trucks), that other manufacturers rely on. Thus, "REV Group basically controls how many fire trucks [other manufacturers] can produce and basically what prices they can set."[95]

---

[93] *Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt, D.C. & Census of the S. Comm. on Homeland Sec. & Gov't Affs*, 119th Cong. (2025) (testimony of Basel Musharbash, Principal Attorney, Antimonopoly Counsel), https://www.hsgac.senate.gov/wp-content/uploads/Musharbash-Testimony.pdf (last visited Nov 18, 2025).

[94] Baker, Farrell & Kovaleski, *supra* note 69; *see also* Fire Apparatus & Emergency Equipment Staff, *REV Group Fire Division Launches New E-Commerce Website for Fire Truck Aftermarket Parts Sales and Service*, Fire Apparatus & Emergency Equipment  (July 29, 2019), REV Group Fire Division Launches New E-Commerce Website for Fire Truck Aftermarket Parts Sales and Service (last visited Nov. 18, 2025).

[95] More Perfect Union, *Did Private Equity Worsen the LA Fires?*, YouTube (Apr. 7, 2025), https://www.youtube.com/watch?v=HvW-RtTRm8w (last visited Nov. 14, 2025).

**AIP makes a lucrative exit by taking REV Group public in an IPO but continues to actively control the company until 2024.**

77.     On January 26, 2017, after years of owning and operating REV Group in private, AIP announced an initial public offering (IPO) of the company, with common stock priced at $22 per share.[96] REV Group thus became a publicly traded company listed on the New York Stock Exchange.[97]

78.     In connection with the IPO, AIP entered into a shareholders agreement that gave itself expansive governance rights and control over REV Group, provided that it holds at least 15% of REV Group's common stock.[98] The agreement granted AIP, among other things, the power to nominate more than five members of REV Group's Board or a majority of directors.[99] AIP also had the power to designate the Chair of the Board, as well as members of the Audit, Compensation, and Nominating and Corporate Governance Committees.[100]

79.     According to the agreement, AIP's express consent was required for REV Group to: (1) amend its bylaws or articles of incorporation; (2) change its name, place of incorporation or location of principal executive offices; (3) conduct any merger or consolidation of the company or spin off a business of a certain size; or (4) sell, convey, or transfer more than 15% of the Company's assets or revenues.[101]

---

[96] *REV Group, Inc. Announces Pricing of Initial Public Offering*, American Industrial Partners (Jan. 27, 2017), https://americanindustrial.com/rev-group-inc-announces-pricing-of-initial-public-offering/ (last visited Nov. 18, 2025).

[97] REV Group, Annual Report (Form 10-K) (Oct. 31, 2017), https://www.sec.gov/Archives/edgar/data/1687221/000156459017025241/revg-10k_20171031.htm (last visited Nov. 18, 2025).

[98] REV Group, Amended & Restated Shareholders Agreement (2017), https://www.sec.gov/Archives/edgar/data/1687221/000119312517006976/d251368dex101.htm (last visited Nov. 18, 2025).

[99] *See id.*

[100] *See id.*

[101] *See id.*

28

80.    These provisions gave AIP disproportionate influence over REV Group's strategic direction and major corporate decisions throughout its investment period, ensuring control over key transactions and governance matters even as its ownership percentage declined over time.

81.    After REV Group's IPO, from 2017 through 2020, AIP held between 52.7 to 54.3% of REV Group's common stock.[102] Following a secondary offering in June 2021, AIP maintained a reduced share count with ownership percentages fluctuating between 42.7% and 46.5%.[103] In early 2024, AIP completed its strategic exit from REV Group by selling its shares of REV Group. As a result, AIP ceased to own a majority of REV Group's common stock. However, AIP Holdings retains a passive interest with 1,767,314 shares in REV Group's outstanding shares.[104]

**The harms of AIP's roll-up strategy are well-documented.**

82.    Roll-up strategies or serial acquisitions by private equity funds like AIP have been heavily criticized as anticompetitive. In a statement submitted to the Organization for Economic Cooperation and Development (OECD), the FTC and DOJ recognized that "[a] pattern or strategy to buy up smaller competitors or firms in the same or related lines of business that pose a competitive threat can reduce competitive pressures in the market, leading to higher profits."[105] Former FTC Chair Lina Khan also described these types of acquisitions as a "stealth

---

[102] REV Group Form 10-K 2017, *supra* note 48; REV Group Form 10-K 2018, https://www.sec.gov/Archives/edgar/data/1687221/000156459018031125/revg-10k_20181031.htm at 50; REV Group Form 10-K  2019, https://www.sec.gov/Archives/edgar/data/1687221/000156459019046328/revg-10k_20191031.htm at 58;  REV Group Form 10-K 2020, https://www.sec.gov/Archives/edgar/data/1687221/000156459021000486/revg-10k_20201031.htm at 63.

[103] REV Group Form 10-K 2021 https://www.sec.gov/Archives/edgar/data/1687221/000156459021060365/revg-10k_20211031.htm.

[104] *See id.*

[105] *Serial Acquisitions and Industry Roll-ups – Note by the United States*, OECD (Dec. 4, 2023), https://one.oecd.org/document/DAF/COMP/WD(2023)99/en/pdf (last visited Nov. 14, 2025).

consolidation scheme," emphasizing that "[f]irms can use serial acquisitions to roll up markets, consolidate power, and undermine fair competition, all while jacking up prices and degrading quality."[106]

83.    The business model of private equity funds—whereby a fund acquires or invests in a target company and attempts to maximize the rate of return over a limited time—is conducive to antitrust violations. To rapidly—and predictably—extract the most revenue, private equity funds "are directly motivated to look for horizontal overlaps or vertical relationships that can be leveraged to provide market power and profits for a portfolio company without catching the eye of an antitrust enforcer."[107]

84.    As an example, private equity funds tend to target highly fragmented industries that provide goods or services for which it is difficult for consumers to pick and choose.[108] Private equity funds also favor industries with high barriers to entry to limit competition posed by newcomers. By acquiring companies in these industries, private equity funds can: (1) escape regulatory scrutiny by keeping acquisition values lower than the Hart-Scott-Rodino (HSR)

---

[106] FTC and DOJ Seek Info on Serial Acquisitions, Roll-Up Strategies Across U.S. Economy (May 23, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/05/ftc-doj-seek-info-serial-acquisitions-roll-strategies-across-us-economy (last visited Nov. 17, 2025).

[107] Kate Conlow & Fiona Scott Morton, *Antitrust Enforcement and Private Equity*, Yale University (May 2023), https://som.yale.edu/sites/default/files/2023-05/TAP_Private_Equity_Paper_4.1_1.pdf (last visited Nov. 17, 2025).

[108] *How Roll-Up Strategies Transform Fragmented Markets*, SBB Capital Partners, https://www.sbbcp.com/insight/roll-up-strategies/ (last visited Nov. 14, 2025).

mandatory reporting threshold;[109] (2) guarantee minimal competition in the market; and (3) inflate returns for investors.[110]

85.    This is indeed what AIP achieved with REV Group. The fire truck manufacturing industry was a perfect target for AIP's roll-up strategy. Before the emergence of REV Group, the industry consisted of mostly local companies spread across the nation. Acquisition of these companies typically fell outside the HSR reporting requirements and/or did not trigger an enforcement action. Fire truck demand is relatively constant regardless of price, and it is very difficult for a new manufacturer to gain a foothold in the industry. As such, once the market was consolidated, REV Group was able to achieve a remarkable return for AIP and its investors by "us[ing] its market power to raise prices, lower quality, repress labor costs" without fear of free market consequences.[111]

86.    Likewise, consolidation of the fire truck manufacturing market was not a coincidence, but the intended result of AIP's serial acquisitions through REV Group. AIP publicly advertises that it derives profits by suppressing competition in essential industries. In explaining its investment criteria, AIP states that it targets "[b]asic-needs industries mission-

---

[109] The Hart-Scott-Rodino Antitrust Improvements Act requires parties to notify the Federal Trade Commission and the Department of Justice of certain transactions for antitrust review. The Act "enables the FTC and the DOJ to determine which acquisitions are likely to be anticompetitive and to challenge them prior to consummation, when remedial action is most effective." The original reporting threshold was $50 million and is adjusted each year. https://www.ftc.gov/sites/default/files/attachments/premerger-introductory-guides/guide1.pdf (last visited Nov. 14, 2025); *New HSR thresholds and filing fees for 2025* (Feb. 6, 2025), https://www.ftc.gov/enforcement/competition-matters/2025/02/new-hsr-thresholds-filing-fees-2025 (last visited Nov. 18, 2025).

[110] *See also Serial Acquisitions and Industry Roll-ups – Note by the United States*, OECD (Dec. 4, 2023), https://one.oecd.org/document/DAF/COMP/WD(2023)99/en/pdf (last visited Nov. 14, 2025).

[111] Kate Conlow & Fiona S. Morton, *Antitrust Enforcement and Private Equity*, Yale University Thurman Arnold Project (May 2023), https://som.yale.edu/sites/default/files/2023-05/TAP_Private_Equity_Paper_4.1_1.pdf (last visited Nov. 14, 2025).

critical to powering the industrial economy" and lists "M&A and industry consolidation" as its strategy.[112]

87.    Recognizing the harm posed by these issues, the federal government has initiated several investigations and lawsuits to address private equity-led serial acquisitions.[113] Just last year, the Federal Trade Commission and Department of Justice launched a joint, public inquiry on the role of private equity and increased market concentration, noting that serial acquirers "can amass significant control over key products . . . without revealing the full scope of their acquisition strategy to federal antitrust enforcers."[114] Notably, REV Group and Pierce Manufacturing have recently disclosed that they are under investigation by the Federal Trade Commission.[115]

### B. Oshkosh and Pierce Manufacturing

88.    In response to REV Group's aggressive expansion strategy, Oshkosh embarked on a consolidation strategy of its own to further entrench its position in the U.S. fire apparatus market.

---

[112] *Investment Criteria*, American Industrial Partners, https://americanindustrial.com/investment-criteria/ (last visited Nov. 14, 2025).

[113] *See, e.g.*, *Fed. T. Comm'n v. U.S. Anesthesia Partners, Inc.*, No. 4:23-CV-03560 (S.D. Tex. Sept. 21, 2023); *JAB Consumer Partners et al.*, (F.T.C. A.L.J, 2022); *United States v. KKR & Co. Inc., et al.* (S.D.N.Y., 2025).

[114] *Request for Information for Public Comment on Corporate Consolidation Through Serial Acquisitions and Roll-Up Strategies*, Fed. T. Comm'n (May 22, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/Serial%20Acquisition%20RFI_5.22.24.pdf (last visited Nov. 14, 2025; *Federal Trade Commission, the Department of Justice and the Department of Health and Human Services Launch Cross-Government Inquiry on Impact of Corporate Greed in Health Care*, Fed. T. Comm'n (Mar. 5, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/03/federal-trade-commission-department-justice-department-health-human-services-launch-cross-government (last visited Nov. 14, 2025).

[115] *Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt., D.C. & Census of the S. Comm. on Homeland Sec. & Gov't Affs*, 119th Cong. (2025), https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/ (last visited Nov. 14, 2025).

89.     In September 2021, Oshkosh acquired through Pierce Manufacturing a 25% ownership interest in BME Fire Trucks LLC ("Boise Mobile") for $5.1 million.[116] Boise Mobile is a major U.S. manufacturer and distributor of custom wildland fire apparatus.[117] The investment was intended to strengthen collaboration in the wildland segment and support Boise Mobile's shift from a factory-direct model to an independent dealer distribution network, with a particular focus on expanding Oshkosh's West Coast coverage.[118]

90.     On June 13, 2022, Oshkosh acquired Maxi-Metal, Inc. ("Maxi-Metal") for $19.7 million.[119] Headquartered in Quebec, Canada, Maxi-Metal is a leading fire apparatus manufacturer for the North American market, with products sold widely across the United States through Pierce Manufacturing's dealer network under a 2016 distribution agreement.[120] With the Maxi-Metal acquisition, Oshkosh converted a long-standing distribution relationship into full ownership and direct control of a competitor's U.S. operations.

91.     Oshkosh also worked to streamline its existing U.S. operations by consolidating brands and reducing geographic overlap among its dealers. In July 2018, it purchased Schuhmacher Fire Equipment through MacQueen Emergency Group, a Pierce Manufacturing

---

[116] Oshkosh Form 10-K (Sep. 30, 2021) at 140; Pierce Manufacturing, Press Release, Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment (Sep. 16, 2021), https://www.piercemfg.com/pierce/press-release/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment (last visited Nov. 14, 2025).

[117] *Id.*

[118] Pierce Manufacturing, Press Release, Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment (Sep. 16, 2021), https://www.piercemfg.com/pierce/press-release/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment (last visited Nov. 14, 2025).

[119] Oshkosh Form 10-K (Dec. 31, 2022) at 93; Oskosh, News releases, Oshkosh Corporation acquires Maxi-Métal Inc. (Jun. 13, 2022), https://www.oshkoshcorp.com/news/2022/6-13-22-maxi-metal (last visited Nov. 14, 2025).

[120] Oshkosh Form 10-K (Dec. 31, 2022) at 93; Vertikal, Oshkosh acquires Maximetal (Jun. 14, 2022), https://vertikal.net/en/news/story/39963/oshkosh-acquires-maximetal (last visited Nov. 14, 2025); Maximetal, An Oshkosh Corporation Business, Find a dealer, https://www.maximetal.com/find-a-dealer/ (last visited Nov., 14, 2025).

subsidiary, thus strengthening MacQueen's position in the upper Midwest—covering Minnesota, Nebraska, South Dakota, North Dakota, and 109 Missouri counties.[121]

92.     In January 2019, Pierce Manufacturing dealer Siddons-Martin Emergency Group expanded its reach through the acquisition of Superior Equipment, increasing its control over a broad area that includes Texas, Louisiana, New Mexico, Utah, and Nevada.[122]

93.     In November 2019, another Pierce Manufacturing dealer—Allegiance Fire and Rescue —acquired Minuteman Fire and Rescue, extending its market into much of New England, including Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.[123]

94.     In September 2023, Firematic Supply Co. Inc., also a Pierce Manufacturing dealer, bought Churchville Fire Equipment, bringing Connecticut and New York under its control.[124]

95.     Most recently, on June 12, 2025, Reliant Fire Apparatus ("Reliant"), another Pierce Manufacturing dealer, acquired Halt Fire, Inc., expanding Reliant's "exclusive Pierce

---

[121] *MacQueen Emergency Group Territory Expanded to Include 109 Missouri Counties*, piercemfg.com  (July 10, 2018), https://www.piercemfg.com/pierce/press-release/macqueen-emergency-group-territory-expanded-to-include-109-missouri-counties (last visited Nov. 14, 2025).

[122] *Siddons-Martin Emergency Group Expands Territory with Acquisition of Superior Equipment*, piercemfg.com  (Jan. 21, 2020), https://www.piercemfg.com/pierce/press-release/siddons-martin-emergency-group-expands-territory-with-acquisition-of-superior-equipment (last visited Nov. 14, 2025).

[123] *Minuteman Fire and Rescue Acquire by Allegiance Fire and Rescue*, Allegiancefr.com (Nov. 19, 2019), https://allegiancefr.com/minuteman-fire-and-rescue-acquired-by-allegiance-fire-and-rescue/ (last visited Nov. 14, 2025).

[124] *Pierce Dealer Firematic Supply Co. Grows Presence in Northeast with Acquisition of Churchville Fire Equipment*, piercemfg.com (Sept. 1, 2023), https://www.piercemfg.com/pierce/press-release/pierce-dealer-firematic-supply-co.-grows-presence-in-northeast-with-acquisition-of-churchville-fire-equipment (last visited Nov. 14, 2025).

territory" to include Michigan, in addition to Wisconsin and Iowa.[125] Pierce Manufacturing

stated that Reliant would "align Michigan operations with its existing territories" to "ensur[e] a

consistent and reliable customer experience."[126]

96.    These consolidations largely eliminated geographic overlaps, substantially

reducing competition among Pierce subsidiaries, and gave Pierce dealers exclusive control across

vast territories.

### C. Rosenbauer

97.    In June 2022, in response to the consolidation moves by REV Group and

Oshkosh, Rosenbauer International A.G. purchased the remaining 25 percent minority stake in

Rosenbauer from General Safety Equipment Corporation.[127] The following year, in March 2023,

Rosenbauer announced that IKON Fire, LLC would join its dealer network to handle fire

apparatus sales in Colorado and Wyoming.[128]

---

[125] *Reliant Fire Apparatus Acquires Halt Fire, Inc. Expands Pierce Dealership Territory to Include the State of Michigan*, piercemfg.com  (Jun 12, 2025), https://www.piercemfg.com/pierce/press-release/reliant-fire-apparatus-acquires-halt-fire-inc.-expands-pierce-dealership-territory-to-include-the-state-of-michigan (last visited Nov. 14, 2025).

[126] *Id.*

[127] *Rosenbauer International Fully Acquires Rosenbauer America*, rosenbauer.com (June 23, 2022), https://www.rosenbauer.com/pl/fr/group/presse/wirtschaftspresse/wirtschaftspresse-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (last visited Nov. 14, 2025).

[128] Rosenbauer America, *Rosenbauer Announces New Partnership with IKON Fire, LLC*, rosenbaueramerica.com (Mar. 30, 2023), https://rosenbaueramerica.com/rosenbauer-announces-new-partnership-with-ikon-fire-llc/ (last visited Nov. 14, 2025).

98.    Rosenbauer assigns exclusive, non-overlapping territories to its dealers, minimizing competition among them.



**IMAGE 3: Geographic territories of Rosenbauer dealers.[129]**

### D. REV Group, Oshkosh, Rosenbauer work together instead of competing against one another.

99.    As they absorbed independent fire apparatus manufacturers and limited competition among their own brands, REV Group, Oshkosh, and Rosenbauer increasingly chose to cooperate rather than compete.

100.    In a revealing admission, Mike Virning, Vice President of Sales for REV Group's fire division, acknowledged this approach: "What I won't tolerate is negative selling. I won't

---

[129] *Contact*, Rosenbauer America, https://www.rosenbauer.com/en-us/contact/contact-partners (last visited Nov. 18, 2025).

tolerate it with our competitors, and I won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'"[130]

101.    REV Group executives have also informed analysts that the company expected to "substantially raise profit margins and that other companies were doing the same."[131]

102.    Executives from the big three repeatedly discussed "price discipline" across their companies. As Oshkosh CEO Wilson Jones told investors in 2017: "We're certainly glad to see more companies consolidating especially publicly traded companies. We think that will help drive better discipline from a pricing standpoint in the market."[132]

103.    That, of course, is exactly what happened.  In 2018, REV Group CEO Tim Sullivan noted that "[p]rices go up every year" and that REV Group was "very pleased with the discipline[] within the fire and emergency markets."[133]

104.    Sullivan later commented that all of the large fire truck manufacturers were thriving, saying "we are going to be kind of even up with our competitors across the board" and "all of us have been at least the large fire brass manufacturers have been doing fine we all have

---

[130] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, fireapparatusmagazine.com (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (last visited Nov. 14, 2025) (emphasis added).

[131] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Nov. 14, 2025) (emphasis added).

[132] Oshkosh Corp. Q2 Earnings Call Transcript (2017), https://seekingalpha.com/article/4065631-oshkosh-osk-q2-2017-results-earnings-call-transcript (last visited Nov. 14, 2025).

[133] REV Group Q1 Earnings Call Transcript (2018), https://seekingalpha.com/article/4154909-rev-groups-revg-ceo-tim-sullivan-on-q1-2018-results-earnings-call-transcript (last visited Nov. 14, 2025).

big backlogs and we're all taking a little bit of share from more of the smaller regional players."[134]

105.    In 2020, Oshkosh's then-President and COO John Pfeifer explained: "[O]n the pricing front, we've maintained a positive price/cost equation for the year. We're very careful and very disciplined in how we manage our pricing. We are the market leader and we'll stay disciplined."[135]

106.    And in September 2025, when asked about the "level of . . . price competition in the market," REV Group CEO Mark Skonieczny replied: "We're currently not seeing that."[136]

107.    According to Jerry Halpin, co-owner and vice president of sales and marketing at C.E.T. Fire Pumps, "people in the fire service industry are talking amongst themselves . . . to bolster opportunities through partnerships and other alliances."[137] He predicted "cooperation between like businesses" as companies sought to "gain an edge in the marketplace."[138]

108.    Oshkosh's then-CEO confirmed as much, telling investors, "there could be some partnerships, potential JVs, there's a lot of conversation going on in the market today with companies working more together than in the past."[139]

---

[134] REV Group Q4 Earnings Call Transcript (2018), https://seekingalpha.com/article/4229537-rev-group-revg-ceo-tim-sullivan-on-q4-2018-results-earnings-call-transcript (last visited Nov. 14, 2025).

[135] Oshkosh Corp. Q4 Earnings Call Transcript (2020), https://seekingalpha.com/article/4382859-oshkosh-corp-osk-ceo-wilson-jones-on-q4-2020-results-earnings-call-transcript (last visited Nov. 14, 2025).

[136] REV Group Q3 Earnings Call Transcript (2025), https://seekingalpha.com/article/4819005-rev-group-inc-revg-q3-2025-earnings-call-transcript (last visited Nov. 14, 2025)..

[137] *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, fireapparatusmagazine.com (Dec. 120, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain (last visited Nov. 14, 2025) (emphasis added).

[138] *Id*. (emphasis added).

[139] Oshkosh Corp. Q1 Earnings Call Transcript (2020), https://seekingalpha.com/article/4319880-oshkosh-corporation-osk-ceo-wilson-jones-on-q1-2020-results-earnings-call-transcript.

### III. Manufacturer Defendants used FAMA to exchange confidential and competitively sensitive information

> People of the same trade seldom meet together,
> even for merriment and diversion, but the
> conversation ends in a conspiracy against the
> public, or in some contrivance to raise prices.
>
> - Adam Smith, *Wealth of Nations* (1776)

109.    REV Group's subsidiaries—E-ONE, Ferrara, KME, Spartan, Smeal, and Ladder Tower—along with Pierce Manufacturing and Rosenbauer, make up the largest fire truck manufacturers in the United States. All of these companies are members of FAMA, which collude.[140] FAMA colludes with Manufacturer Defendants to coordinate the exchange of information through statistical reports and semiannual in-person conferences.

#### A. FAMA Statistical Reports

110.    FAMA operates as a central hub for information sharing among fire truck manufacturers such as Manufacturer Defendants. According to FAMA, access to competitors' data is a specific and "invaluable" reason to join the organization.[141]

111.    Indeed, the president of FAMA's board of directors stated that FAMA's "mission" is to "maximize profits of FAMA member companies" and that one of the "primary reasons" that "companies join FAMA" is FAMA's "[s]tatistics."[142] To make this data useful, FAMA's "goal is to provide quality data in a timely manner."[143]

112.    FAMA maintains a dedicated Data & Research Committee (the "Committee") that facilitates collaboration among competing fire truck manufacturers. The Committee's stated

---

[140] *Members List*, Fire Apparatus Mfrs. Ass'n (Mar. 27, 2025), https://web.archive.org/web/20250327160713/https:/www.fama.org/members/list/ (last visited Nov. 14, 2025).

[141] *Why Join?*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/why-join/ (last visited Nov. 18, 2025).

[142] FAMA Meeting Minutes (Feb. 28, 2022), https://www.fama.org/wp-content/uploads/2023/02/1677348633_63fa4f190edd4.pdf (last visited Nov. 14, 2025).

[143] *Id.*

mission is to "strengthen FAMA member companies by providing actionable data for strategic business planning."[144] This includes "economic data, fire market trends, and apparatus sales and order statistics."[145] The Committee's responsibilities include "collect[ing] and distribut[ing] data regarding apparatus sales and orders" and providing these reports at least quarterly.[146] FAMA states that its "[m]embers find this research invaluable for their internal business purposes."[147]



**MISSION**

The mission of the Data & Research Committee is to help strengthen FAMA member companies by providing actionable data for strategic business planning. This includes economic data, fire market trends, and apparatus sales and order statistics.

**OBJECTIVES**

- To collect and distribute data regarding apparatus sales and orders on a quarterly basis
- To gather data from various sources that is helpful in business planning by member companies

**IMAGE 4: FAMA Data & Research Committee, "Mission" and "Objectives"[148]**



**ADDED BENEFITS**

Among the most powerful benefits of FAMA membership are the statistical reports provided quarterly and encapsulated for every year-end. Only those companies that participate in the statistical studies and members are privy to these reports. FAMA does not release this information to the public. Members find this research invaluable for their internal business purposes.

**IMAGE 5: FAMA Membership, "Why Join"[149]**

113.    According to FAMA, "[t]he Data and Research Committee oversees collection and presentation of the most comprehensive data set in the industry" and this "data helps to

---

[144] *Data & Research Committee* Fire Apparatus Mfrs. Ass'n, https://www.fama.org/data-research-committee (last visited Nov. 14, 2025).

[145] *See id.*

[146] *Id.*

[147] *Why Join?*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/why-join (last visited Nov. 14, 2025).

[148] *Data & Research Committee*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/data-research-committee/ (last visited Nov. 14, 2025).

[149] *Why Join?*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/why-join/ (last visited Nov. 14, 2025).

monitor and understand trends in the fire service."[150] A 2022 FAMA presentation, for example, listing Pierce and Rosenbauer as Committee co-chairs, references the Committee's efforts in putting together an "industry forecast" as well as continuing to "publish[] quarterly data in a timely manner."[151] FAMA has explained that this "detailed data is reserved exclusively for [its] members."[152]

114.    The Committee maintains an online data portal where fire truck manufacturers upload economic data. The data is sent to an accounting firm for processing and returned to the Committee, which then uploads the processed data to the FAMA website.

115.    FAMA restricts access to this information, which it "does not release . . . to the public."[153] Instead, it is stored and available in a secure, members-only section of the website.[154] As FAMA explains: "Only those companies that participate in the statistical studies and members are privy to these reports."[155]

116.    FAMA limits membership to companies that can meet strict eligibility criteria. Eligible companies must either (a) manufacture fire-fighting or fire protection apparatus, including rescue vehicles, or (b) produce components that become part of such fire apparatus,

---

[150] *FAMA Releases Fire Apparatus Industry Update*, Fire Apparatus & Emergency Equipment (May 27, 2025), https://www.fireapparatusmagazine.com/fama/fama-releases-fire-apparatus-industry-update/. (last visited Nov. 14, 2025).

[151] FAMA 2022 Spring Meeting Presentation, https://www.fama.org/wp-content/uploads/2022/03/1646772045_6227bf4d537dc.pdf (last visited Nov. 14, 2025).

[152] Paul C. Darley, *The Fire Apparatus Market Is Coming Back…Just look at the Data*, FAMA (Dec. 4, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/ (last visited Nov. 14, 2025).

[153] *Id.*

[154] *Why Join FAMA*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Nov. 14, 2025).

[155] *Why Join?*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/why-join; [155] Paul C. Darley, *The Fire Apparatus Market Is Coming Back…Just look at the Data*, FAMA (Dec. 4, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data (last visited Nov. 14, 2025).

such as chassis, fire pumps, fire hoses, hose reels, ladders, aerial devices, apparatus valves and other water control equipment.[156]

117.    Notably, purchasers of fire apparatus—such as fire departments and municipalities—cannot qualify for membership and therefore do not have access to the data exchanged among manufacturers.

118.    Even among members, access to FAMA's reports is restricted to those manufacturers that contribute data. FAMA's policy provides that access to the data "may be denied" to any company "that was given the opportunity to participate in the program but refused," creating a pay-to-play scheme.[157] FAMA's policy also provides that access may be denied to any company "that does not agree in advance of participation to keep the results confidential."[158]

### B. FAMA Meetings

119.    FAMA not only distributes confidential and sensitive economic data to its members, but also organizes two large meetings a year to "provide a forum [for members] to share information" in person.[159]

120.    As one fire equipment manufacturer explained on their website, "We just got back from the FAMA meeting, that's the Fire Apparatus Manufacturers Association meeting, and I'll tell you, all of the talk down there was about industry statistics. And, while I can't share those details with you, unless you're a FAMA member, what I can tell you is last year in 2022, there were over 6000 new fire apparatus sold here in the United States."[160]

---

[156] *Why Join?*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/why-join (last visited Nov. 14, 15, 2025).

[157] Statistics, Fire Apparatus Mfrs Ass'n, https://www.fama.org/statistics/.

[158] *Id.*

[159] *Why Join?*, Fire Apparatus Mfrs Ass'n. https://www.fama.org/why-join (last visited Nov. 14, 2025).

[160] Inside Darley (Mar. 31, 2023), https://www.darley.com/media/inside-darley-april-2023/?utm_source=chatgpt.com (last visited Nov. 14, 2025).

121.    These meetings attract participants from across the fire truck manufacturing industry, including direct competitors. Attendees observe presentations covering market trends and economic forecasts in the industry and use the event to network with each other.



**IMAGE 6: Anirban Basu, Chairman & CEO of the Sage Policy Group, presenting an economic forecast at a FAMA gathering.[161]**

122.    Participants also take part in "purchasing roundtables," members-only sessions, and discussion groups organized by FAMA. These events gave Manufacturer Defendants repeated opportunities to share competitively sensitive economic information and coordinate on supply and pricing decisions. FAMA promotes these "networking" opportunities as a key benefit of membership.[162]

123.    In addition to its reports and in-person meetings, FAMA "communicates with its members on a regular basis via emails, its website and an extensive FAMA newsletter."[163] These regular communications further enable information sharing and coordination among Manufacturer Defendants.

---

[161] *FAMA Membership Meetings*, Fire Apparatus Mfrs. Ass'n, YouTube (Feb. 26, 2016), https://www.youtube.com/watch?v=dbdjUvqfFAw (last visited Nov. 19, 2025).

[162] *Why Join FAMA*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Nov. 19, 2025).

[163] *Id.*

124.    Manufacturer Defendants regularly attend FAMA meetings together and are heavily involved in the organization. For example, Phil Gerace of E-ONE is chairman of the FAMA Bylaws Committee; John Schultz of Pierce Manufacturing is vice-chair of the Data & Research Committee: Drew Kirvida of Rosenbauer has served on the same Committee with Schultz; Larry Daniels from E-ONE chairs the Marketing & Trade Shows Committee; and Roger Lackore of Spartan is the chairman of the Technical Committee, along with John Brady (KME), Wyatt Compton (Spartan), and Dale Katz (E-ONE). Representatives from each of the Manufacturer Defendants were also registered attendees at the 2025 FEMSA / FAMA Annual Fall Conference.[164] Their involvement is not new: Rosenbauer was featured on a panel at the 2017 FEMSA / FAMA Annual Fall Conference,[165] and in 2010, Lee Morris of Oshkosh—who was a member of FAMA's Governmental Affairs committee at the time—publicly praised the conference as an important opportunity for "developing personal and working relationships."[166]

## IV.    The conspiracy allowed Manufacturer Defendants to restrict supply and inflate the prices of fire trucks during the class period.

### A.    Fire truck production backlogs increased by at least 40% during the class period.

125.    After the economy recovered from the 2008 Financial Crisis, demand for fire trucks grew steadily until 2020. Between 2020 and 2022, orders peaked. Since 2022, orders have remained steady at between 5,500 and 6,500 trucks each year—around the same level as the early 2000s.[167]

---

[164] *List of Registered Attendees* (2025), https://www.femsafamafallconference.org/wp-content/uploads/2025/09/2025-9-15-Registration-Report-1.pdf (last visited Nov. 19, 2025).

[165] *FAMA Annual Fall Conference*, https://www.fama.org/wp-content/uploads/2017/09/1506380367_59c98a4fbf472.pdf (last visited Nov. 19, 2025).

[166] *FAMA – Answering the Call*, https://www.fama.org/wp-content/uploads/2015/09/1442765054_55fed8fee7ec2.pdf (last visited Nov. 19, 2025).

[167] *See, e.g.*, *Sounding the Alarm: America's Fire Apparatus Crisis* (Sept. 10, 2025), *https://www.hsgac.senate.gov/subcommittees/dmcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/.* (last visited Nov. 14, 2025).

126.    Manufacturer Defendants have failed to meet this heightened demand. In recent years, production delays have caused a dramatic increase in order backlogs. For example, REV Group reported a record $3.6 billion backlog in late 2023—an increase of 41% from just one year prior.[168] REV Group's backlog increased last year, reaching $4.4 billion in unfulfilled fire and emergency vehicle orders as of October 2024.[169] Indeed, REV Group's backlog more than quadrupled from $1.1 billion in 2017 to $1.78 billion in 2020 to $4.47 billion in 2024.

127.    Oshkosh and Rosenbauer have reported similar production shortfalls. Oshkosh's backlog of unfulfilled fire truck orders, tracking REV Group's backlog, also quadrupled between 2019 and 2023—from $970 million in 2019 to approximately $4 billion in 2024.[170] Rosenbauer reported a $2.67 billion backlog at the close of 2024.[171]

128.    These backlogs and supply restrictions have caused severe delivery delays. Wait times for new fire trucks have more than quadrupled in some cases—from about one year to 4.5 years.[172] This has caused serious problems for the City of Revere and other municipalities.

129.    For example, the Plaintiff City of Revere has experienced significant delays when purchasing fire apparatus, including pumper and ladder trucks from the Defendants. Previously,

---

[168] Reuters, Fire Truck Boom Highlights Divide in US Manufacturing, U.S. NEWS (Jan. 19, 2024), https://money.usnews.com/investing/news/articles/2024-01-19/fire-truck-boom-highlights-divide-in-us-manufacturing (last visited Nov 14, 2025).

[169] Rev Group, Inc. SEC Form 10K (Oct. 31, 2024), https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm (last visited Nov. 14, 2025).

[170] Baker, Farrell & Kovaleski, *supra* note 69.

[171] Christian Sandherr, *Rosenbauer International AG: Solid Start Into the Year/ Record High Order Backlog*, NuWays (May 14, 2025), https://www.nuways-ag.com/company/rosenbauer-international-ag/research/solid-start-into-the-year-record-high-order-backlog ("Q1 sales grew by 16.8% yoy to € 264m (eNuW: € 265m) thanks to the company's strong order backlog of € 2.28bn at the end of FY24.")(last visited Nov. 14, 2025).

[172] Ltr. from Am. Econ. L. Union to Pam Bondi, Att'y Gen., U.S. Dep't of Just., Andrew Ferguson, Chair, Fed. T. Comm'n at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Nov. 14, 2025).

purchases of trucks might take a year or less. But now, the City has found that sometimes purchases are not fulfilled for roughly 3 years, putting significant strain on their fire department's ability to keep their fleet modern and operational. Ensuring a healthy and modern fleet is critical to fire response preparedness, and also to the health, safety, and protection of the City of Revere's many brave firefighters who risk their lives fighting fires. These firefighters, like those across the country, depend on high-functioning, modern, dependable fire trucks.

130.    The City of Revere has had to borrow trucks from neighboring cities, or have had to rely on rehabilitated old trucks while they await new apparatus orders being completed. For example at one point, the City of Revere had to spend substantial repair costs to rehabilitate a roughly 20-year old truck while awaiting the delivery of a new truck for one of the city's new fire stations. At that the same time that delays have vastly increased, prices have also significantly increased.

131.    Similarly, Sue Finkam, mayor of Carmel, Indiana, explained that her growing city required additional fire stations, but the price of a new pumper truck increased by approximately 10% in a single year, while the delivery time for a tiller apparatus is now more than four years.[173] She expects the city "to be able to acquire land, design a fire station, construct the building, hire firefighters and train them, while still waiting for the station's fire engines to be delivered."[174]

132.    Firefighters in online forums have expressed similar frustrations with the severe backlogs caused by Manufacturer Defendants. In January 2023, one firefighter complained that "lead times for delivery from date the order is placed to final inspection has gone from 10-12

[173] Press Release, Sen. Jim Banks, *Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing* (Apr. 15, 2025), https://www.banks.senate.gov/news/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing/ (last visited Nov. 14, 2025).

[174] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. Times (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Nov. 14, 2025).

months to greater than 2 years in many cases and in some cases approaching 3 years."[175]Another reported that a REV Group dealer "added 15 months to the delivery time" for a new fire truck.[176] A third stated that "a very cookie cutter" fire truck "without any interior customization" now takes 48 months for delivery from a Pierce Manufacturing dealer.[177] Yet another described waiting 435 days for a single Rosenbauer component ordered in August 2022, for a total lead time of about three years.[178]

133.    These accounts are supported by industry data. In 2022, fire apparatus orders rose to 45% above normal levels, while order fulfillment fell nearly 10% below average, as shown in the chart below. Although fulfillment rates have slightly improved in recent years, they have not meaningfully reduced the backlog.

---

[175] *Skyrocketing Apparatus Costs and Outrageous Delivery Times*, NYCFire.net, https://www.nycfire.net/forums/threads/skyrocketing-apparatus-costs-and-outrageous-delivery-times.75187 (last visited Nov. 14, 2025).

[176] *Id.*

[177] *Id.*

[178] *Id.*



**IMAGE 7: North America Fire Apparatus Trend.**[179]

134.    These ongoing production delays cannot be explained by external factors such as COVID-19 or other global disruptions. While various industries were impacted by supply chain issues in 2021 and 2022, the Federal Reserve Bank of New York's Global Supply Chain Pressure Index returned to baseline by early 2023, reaching a record low in May 2023.[180] There is therefore no legitimate justification for continued production crisis among Manufacturer Defendants.

**B.  Contrary to basic market principles, Manufacturer Defendants refused to increase production capacity and, in some cases, exacerbated the shortage by shutting down manufacturing facilities**

135.    Basic economic principles explain that a surge in demand should lead to a corresponding increase in manufacturing capacity. Inexplicably, however, Manufacturer

---

[179] *FAMA Releases Fire Apparatus Industry Update*, Fire Engineering (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update (last visited Nov. 14, 2025).

[180] Diccon Hyatt, *Supply Chains Have Healed From Pandemic Disruptions*, Investopedia (June 7, 2023), https://www.investopedia.com/supply-chains-have-healed-from-pandemic-disruptions-7509263 (last visited Nov. 14, 2025).

Defendants made no investments to substantially increase their production capacity or manufacturing output to meet market demands.

136.    Instead, Manufacturer Defendants "have invested only the bare minimum required to replace depreciated equipment at existing fire apparatus plants."[181] For instance, under AIP's management and direction, REV Group had a policy of limiting capital expenses that will not immediately "improve returns on invested capital."[182] Alexander Yaggy, a former REV Group shareholder, called out REV Group's refusal to meet its "$4 billion backlog" as "reflective of an uncompetitive market."[183] REV Group has only recently invested a tiny portion of its revenue (about one percent) on maintaining its buildings and equipment.[184] These investment levels are significantly lower than those in other industries.

137.    Similar to REV Group, neither Oshkosh nor Rosenbauer have increased their production capacities in a meaningful way to meet the demands of the market.

138.    Rather than expand production, Manufacturer Defendants have reduced output by closing existing manufacturing facilities, exacerbating the backlog crisis. In September 2021, REV Group shut down two KME custom fire truck manufacturing facilities located in Pennsylvania and Virginia,[185] cutting its total manufacturing footprint by roughly one-third.[186]

---

[181] *Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt, D.C. & Census of the S. Comm. on Homeland Sec. & Gov't Affs*, 119th Cong. (2025) (testimony of Basel Musharbash, Principal Attorney, Antimonopoly Counsel), https://www.hsgac.senate.gov/wp-content/uploads/Musharbash-Testimony.pdf (last visited Nov. 14, 2025).

[182] *Id.*

[183] Baker, Farrell & Kovaleski, *supra* note 69.

[184] *Id.*

[185] Chris Reber, KME Plant to Close in April 2022, Times News Online,  (Sept. 11, 2021), https://www.tnonline.com/20210911/kme-plant-to-close-in-april-2022 (last visited Nov. 14, 2025).

[186] Baker, Farrell & Kovaleski, *supra* note 69.

REV Group openly boasted to investors about reducing manufacturing facilities.[187]



**IMAGE 8: Slide from a REV Group investor presentation**

139.    In a press release, REV Group announced that pending orders at these facilities would be reassigned to other REV Group plants.[188] The obvious effect of such transfers and other supply restrictions were additional delays on top of an already severe backlog.

140.    Chief Matthew R. Timerman's fire department had ordered a $1.2 million ladder truck from REV Group that was to be built at the KME Pennsylvania plant.[189] Since the plant's closure, however, the work of assembling the truck was spread across three different

---

[187] *Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt, D.C. & Census of the S. Comm. on Homeland Sec. & Gov't Affs*, 119th Cong. (2025) (testimony of Basel Musharbash, Principal Attorney, Antimonopoly Counsel), https://www.hsgac.senate.gov/wp-content/uploads/Musharbash-Testimony.pdf (last visited Nov. 14, 2025).

[188] Andrew Corselli, *REV Group Announces Plans to Shift KME Production to Other REV Fire Group Facilities*, Fire Apparatus & Emergency Equipment (Sept. 10, 2021), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-announces-plans-to-shift-kme-production-to-other-rev-fire-group-facilitie (last visited Nov. 14, 2025).

[189] Baker, Farrell & Kovaleski, *supra* note 69

manufacturing sites, requiring additional time for completion.[190] Ultimately, the process took over four years from order to delivery.[191]

141.    Despite their inability to meet the market's demands, Manufacturer Defendants appear unfazed that their customers might cancel orders and choose to do business with a competitor—symptomatic of an anticompetitive market.[192]

142.    During a 2023 earnings call, Mark Skonieczny, REV Group's current CEO, stated that the company did not expect to suffer losses from the backlogs because once municipalities allocate funds for a fire truck, those funds are "earmarked" and followed by a deposit: "That money is allocated to those units, so we feel good about that."[193] Skonieczny expressed confidence that the delays were not impacting REV Group's market share and noted that other manufacturers are also experiencing longer lead times.[194] In its SEC filings, REV Group reported that the backlogs actually benefits shareholders because it provides "strong visibility into future net sales."[195]

143.    At a 2025 Senate hearing, REV Group president Mike Virnig testified—despite closing manufacturing plants amid skyrocketing backlogs—that "everything we do in the fire division is to build more trucks" and that "we agree that backlogs are too long." Virnig (falsely)

---

[190] *Id.*

[191] *Id.*

[192] Musharbash, *supra* note 28.

[193] Baker, Farrell & Kovaleski, *supra* note 69.

[194] Eman Abu-Khaled, *REV Group Takes Steps to Normalcy After Supply-Chain Setbacks*, Trailer Body Builders (Mar. 22, 2023), https://www.trailer-bodybuilders.com/truck-bodies/article/21262503/rev-group-takes-steps-to-normalcy-after-supply-chain-setbacks (last visited Nov. 14, 2025).

[195] Musharbash, *supra* note 28.

blamed this backlog on an increase in orders in 2022 and 2023. Pierce's VP of Sales, Dan Meyer, likewise testified that the growing lead time is "bad for [Pierce's] business."[196]

144.    But for years—far before the peak in orders—Manufacturer Defendants have boasted about growing backlogs. In 2018, for example, REV Group CEO Tim Sullivan said, "We like backlog, we love backlog. We like long backlogs that are out for months."[197] In 2019, Sullivan continued to cite "a record backlog level" as "an encouraging sign."[198] In January 2020, Oshkosh also boasted about record backlogs, noting "[o]ur Fire & Emergency team posted a solid quarter characterized by strong order growth and an all-time high backlog."[199] And in a 2025 Investor Day presentation, Oshkosh stated that it intended to further increase its profit margins to record levels through "[p]ricing realization from backlog":[200]

---

[196] *Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt., D.C. & Census of the S. Comm. on Homeland Sec. & Gov't Affs*, 119th Cong. (2025), https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/ (last visited Nov. 14, 2025).

[197] REV Group Inc. Q2 Earnings Call Transcript (2018), https://seekingalpha.com/article/4180201-rev-group-revg-ceo-tim-sullivan-on-q2-2018-results-earnings-call-transcript (last visited Nov. 14, 2025).

[198] REV Group, Inc. Q1 Earnings Transcript (2019), https://www.fool.com/earnings/call-transcripts/2019/03/07/rev-group-inc-revg-q1-2019-earnings-conference-cal.aspx (last visited Nov. 18, 2025).

[199] Oshkosh Corp. Q1 Earnings Call Transcript (2020), https://www.fool.com/earnings/call-transcripts/2020/01/29/oshkosh-corp-osk-q1-2020-earnings-call-transcript.aspx (last visited Nov. 18, 2025).

[200] Oshkosh Corp. Investor Day Presentation at 87 (2025), https://online.flippingbook.com/view/29819025/ (last visited Nov. 18, 2025).



**IMAGE 9: Revenue growth supported by strong backlog**

145.    In short, rather than meeting demand, Manufacturer Defendants have chosen to restrict supply. In a properly functioning competitive market, rational companies would boost production to meet rising demand, invest in facilities and further manufacturing capacities, satisfy the needs of customers, and outperform competitors. But in the fire apparatus market, the opposite is true. The big three have shuttered factories and restricted supply despite growing demand.

**C.  As a result, fire truck prices doubled during the class period.**

146.    Fire truck prices surged to a record level while demand grew but supply remained flat or even declined. A standard pumper truck that used to cost approximately $300,000 to

$500,000[201] now averages around $1 million.[202] Similarly, ladder trucks that sold for between $750,000 and $900,000 in the mid-2010s can now exceed $2 million.[203] Fire truck prices have doubled.

147.    Regarding these market conditions, the owner of a Wisconsin-based fire equipment company observed that the industry has "reached a new level of price psychology. Today, relationships start at a half million dollars, and 10 years ago that was a remote concept."[204]

148.    Fire apparatus customers are unable to find a competitive alternative. As one industry executive explained, "[t]here are now times when all vendors at a bid table, each with a 'different' product, are all owned and managed by the same parent company. How is that competitive for the purchaser?"[205] Consequently, fire departments nationwide are forced to pay the inflated prices and await the long delays imposed by Manufacturer Defendants

---

[201] Musharbash, *supra* note 28.; *see also* Chris Godfrey, *An Evaluation of Fire Apparatus Usage and Operating Cost for Green Township Fire & EMS* at  9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188 (last visited Nov. 14, 2025); Patrick Varine, *Despite Grant, PA Dept. Says Rising Apparatus Costs a Challenge*, Firehouse  (Aug. 3, 2023), https://www.firehouse.com/apparatus/news/53068052/despite-fire-act-grant-export-pa-fire-department-says-rising-fire-apparatus-costs-a-challenge ("'In 1994, we brought a new KME front-line pumper truck in for $200,000,' Export fire Chief and Councilman David Silvis said. 'Today, we're probably between $800,000 and $900,000 to fund this new truck.'") (last visited November 18, 2025).

[202] Musharbash, *supra* note 28.

[203] Baker, Farrell & Kovaleski, *supra* note 69; Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, Reuters (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Nov. 14, 2025); Musharbash, *supra* note 28.

[204] Chris Mc Loone, *Fire Industry Outlook: 10 Years After the Great Recession*, Fire Apparatus & Emergency Equipment  (Dec. 1, 2018), https://www.fireapparatusmagazine.com/fire-apparatus/fire-industry-outlook-10-years-after-the-great-recession (last visited Nov. 14,2025).

[205] Musharbash, *supra* note 28.

### D. Manufacturer Defendants exploited "floating prices" to further increase prices for fire trucks during the class period.

149.    Manufacturer Defendants capitalized on the prolonged production backlog and supply restrictions by inserting "floating price" clauses into customer contracts, enabling them to raise the final price of a fire truck even after production had begun. Citing years-long backlogs and alleged supply disruptions, Manufacturer Defendants used this mechanism to impose additional surcharges and significantly increase prices—well above the already inflated initial contract prices enabled by their collusion. Rosenbauer's president, Mark Fusco, admitted his company adds "surcharges that might occur during the build times" on customers.[206]

150.    Manufacturer Defendants justify such price increases by relying on the significant, years-long backlog and purported supply issues over that period. Using this "floating price" mechanism, Manufacturer Defendants can charge an even higher price—the initial contract price already at an inflated level due to concentrated market conditions—years after a fire department initially places an order.[207]

151.    The use of "floating prices" placed further financial strain on fire departments already struggling to acquire new fire trucks. One Massachusetts fire department, for example, ordered a fire truck in 2022 and added two more to their order in 2023.[208] The manufacturer then increased the price of the 2022 fire truck order by $150,000 to match the price of the 2023 order and refused to deliver on the 2022 order unless the fire department accepted the increase.[209] The fire chief explained that he felt "compelled to pay this increase out of fear that the process to get

---

[206] Ed Ballam, *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, Fire Apparatus & Emergency Equipment (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain (last visited Nov. 14, 2025).

[207] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing (last visited Nov. 19, 2025).

[208] *See id.*

[209] *See id.*

apparatus would take too long and we would not be able to provide service to our community."
[210]

152.    Other departments experienced similar treatment. A Kansas fire department saw the price of a truck increase by 22% before delivery.[211] In Indiana, one department faced an increase of over $100,000 after a seven-month delay on a pumper truck order, while another was "forced" to accept a $209,950 increase after a three-year wait "since the alternative was to continue using a 30-year-old fire engine."[212] Likewise, the Loveland Fire Rescue Authority in Colorado incurred a surcharge of $29,000 on a pending order.[213]

---

[210] *See id.*

[211] *Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt, D.C. & Census of the S. Comm. on Homeland Sec. & Gov't Affs*, 119th Cong. (2025) (testimony of Dennis L. Rubin, Fire Chief, Kansas City Kansas Fire Dep't), https://www.hsgac.senate.gov/wp-content/uploads/Rubin-Testimony.pdf (last visited Nov. 19, 2025).

[212] *Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt, D.C. & Census of the S. Comm. on Homeland Sec. & Gov't Affs.*, 119th Cong. (2025) (testimony of Edward A. Kelly, Gen. President, Int'l Ass. of Firefighters), https://www.hsgac.senate.gov/wp-content/uploads/Kelly-Testimony.pdf (last visited Nov. 19, 2025).

[213] "Floating" Prices & Lengthy Delivery Times for Fire Apparatus CSFC Members' Perspective, at 1, https://static1.squarespace.com/static/5ea64a6b9614427b0ff93e6d/t/63080a517f782438bdd6f98e/1661471313934/Floating+Prices+Lenghty+Delivery+Time+for+Fire+Apparatus+Aug+25+2022%5B42%5D.pdf (last visited Nov. 19, 2025).

### E. Defendants' conspiracy had the intended effect of increasing manufacturers' margins and revenues

153.    Except for brief disruptions during the pandemic years, revenues across the fire truck manufacturing industry have grown steadily and significantly since 2015, reflecting the overall market effects of Defendants' coordinated price increases:



**IMAGE 10: Fire Truck Manufacturing Revenue in the United States.**[214]

154.    Defendants have reaped substantial profits.

155.    In July 2021, REV Group announced that it had "[e]xceeded consensus earnings estimates for five consecutive quarters."[215] By 2024, REV Group reported that its fire apparatus division had achieved what it called an "exceptional 8.9 percent" profit margin.[216]

156.    In early 2024, AIP completed its strategic exit from REV Group through a two-part stock sale. On February 20, 2024, AIP disposed of 18,400,000 shares for approximately

---

[214] Oliwier Samorajski, *Fire Truck Manufacturing in the US – Market Research Report (2015-2030)*, IBIS WORLD (Apr. 2025), https://www.ibisworld.com/united-states/industry/fire-truck-manufacturing/5645 (last visited Nov. 19, 2025).

[215] REV Group, Inc. Presentation, REV GROUP at 4 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Nov. 19, 2025).

[216] Baker, Farrell & Kovaleski, *supra* note 69.

$290 million in gross proceeds,[217] followed by a second offering on March 15, 2024, in which it sold an additional 7,385,191 shares for approximately $127.6 million.[218]

157.    Oshkosh likewise reported surging profits. In June 2025, the company stated that its operating margins had grown from 4.8% to 10.5% in just two years, claiming to have met "key 2022 Investor Day targets one year early."[219] Oshkosh further projected its adjusted operating margins would rise to between 12% and 14% by 2028, supported by "strong backlog" and continued price increases, with expected revenues of $13-14 billion.[220]

158.    Rosenbauer also reported record revenues and backlog.[221]

## V.  Market Structure

### A.  The Relevant Market is the sale of all fire trucks in the United States.

159.    In antitrust, a relevant market refers to "an area of effective competition" between firms, consisting of both "product" and "geographic elements."[222]

160.    Manufacturer Defendants each sell fire trucks throughout the United States.

---

[217] AIP Fund IV, SEC Form 4 (Feb. 20, 2024), https://www.sec.gov/Archives/edgar/data/1390368/000095010324002438/xslF345X05/dp20704 0_4-aipcf4lp.xml (last visited Nov. 19, 2025).

[218] Investing.com, *Rev group sees $127.6 million in stock sold by American Industrial Partners* (Mar. 15, 2024), https://www.investing.com/news/stock-market-news/rev-group-sees-1276-million-in-stock-sold-by-american-industrial-partners-93CH-3340665 (Last visited Nov. 19, 2025).

[219] Oshkosh, Investor Day at 83 (June 5, 2025), https://online.flippingbook.com/view/29819025/3 (last visited Nov. 19, 2025).

[220] *Id.* at 86.

[221] Iain Hoey, *Rosenbauer Group Reports Record Revenues and Order Backlog for 2024*, Int'l Fire & Safety Journal (Feb. 17, 2025), https://internationalfireandsafetyjournal.com/rosenbauer-group-reports-record-revenues-and-order-backlog-for-2024/ (last visited Nov 19, 2025); Iain Hoey, *Rosenbauer Achieves €1.3 Billion Revenue and Reduces Net Debt in 2024*, Int'l Fire & Safety J. (Apr. 24, 2025), https://internationalfireandsafetyjournal.com/rosenbauer-achieves-e1-3-billion-revenue-and-reduces-net-debt-in-2024/ (last visited Nov. 19, 2025).
[222] *4.3. Market Definition*, U.S. Dep't of Just. Antitrust Div. (July 2, 2024), https://www.justice.gov/atr/merger-guidelines/tools/market-definition (last visited Nov. 19, 2025).

Accordingly, the relevant product market is the market for fire trucks, and the relevant geographic market is the United States.

161.    The National Fire Protection Association ("NFPA") Standard 1900 and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing classify seven types of fire trucks used across the United States, all of which are at issue in this case and included in the relevant product market:[223]

**Type 1** fire trucks—commonly called engine companies, engine pumpers, or structural firefighting trucks—are the most prevalent type in use today. They are deployed by urban, suburban, and rural fire departments. Each Type 1 truck carries all NFPA-required firefighting equipment and supports both structural firefighting and initial emergency medical services. These vehicles must have a minimum 300-gallon water pump tank and be equipped with 2.5- and 1.5-inch hoses of varying lengths. They must also include ground ladders, nozzles, forcible entry equipment, rear access and egress, and basic first aid equipment. Type 1 trucks are designed to carry four firefighters.

**Type 2** fire trucks also carry all NFPA-required firefighting equipment and support both structural firefighting and initial emergency medical services. They are most commonly used in urban and suburban settings and typically carry three to four firefighters.

**Type 3** fire trucks, often called wildland or brush trucks, are primarily used in rural or wildland environments. Under NFPA standards, a Type 3 engine must have at least a 500-gallon water tank and a pump capable of delivering 150 gallons per minute at a pressure of 250 pounds per square inch. Many Type 3 trucks also include a diesel-powered auxiliary pump to enable "pump-and-roll" technique, allowing the truck to be driven while crew members man the pump and hoses. This allows firefighters to follow the path of forest and brush fires as they move with the weather or to establish fire lines by soaking areas ahead of an advancing wildfire. Type 3 engines must be equipped to carry

---

[223] *Types of Fire Trucks: An Overview and Comparison*, Pierce (Nov. 14, 2023), https://www.piercemfg.com/pierce/blog/types-of-fire-trucks (last visited Nov. 19, 2025).

at least three crew members.

**Type 4** fire trucks are also used in wildland firefighting. Compared to Type 3 trucks, they have larger water tanks—at least 750 gallons—but reduced hose capacity requirements. Type 4 trucks must be able to deliver at least 50 gallons per minute at a pressure of 100 pounds per square inch and be equipped to carry at least two people.

**Types 5, 6, and 7** fire trucks share similar design characteristics. These vehicles are typically built on pick-up style, four-wheel-drive, medium duty chassis. They are differentiated mainly by their gross vehicle weight rating ("GVWR"): Type 5 trucks have a maximum GVWR of 26,000 pounds, Type 6 trucks 19,500 pounds, and Type 7 trucks 14,000 pounds. Each type is typically equipped with a 300-gallon water tank and a small booster pump capable of at least 50 gallons per minute. These vehicles must be equipped to carry two firefighters.

162. Certain trucks are customized to meet additional NFPA standards. For example, NFPA Chapter 5 governs Pumper Fire Apparatus, Chapter 9 governs Quint Fire Apparatus, Chapter 11 governs Mobile Foam Fire Apparatus, and Chapter 19 governs Aerial Fire Apparatus. The latter category includes trucks equipped with aerial ladders, elevating platforms or towers, and water tower devices.[224] These specialized trucks are also included within the relevant product market.

### B.  Manufacturer Defendants share market power in the relevant market.

163. The fire truck manufacturing has hallmark features typically found in markets with cartel behavior, including but not limited to (1) a highly concentrated market; (2) high barriers to entry; and (3) inelastic demand.

---

[224] Pierce, *Types of Aerial Fire Trucks: NFPA Classification Overview* (Nov. 8, 2022), https://www.piercemfg.com/pierce/blog/types-of-aerial-fire-truck (last visited Nov. 19, 2025).

i.        **High market concentration**

164.    The fire truck manufacturing market is highly concentrated and dominated by just three companies—REV Group, Oshkosh, and Rosenbauer. Together, they account for the vast majority of domestic preproduction and sales. REV Group generates roughly $1 billion in annual U.S. fire truck sales, Oshkosh around $750 million, and Rosenbauer about $307 million. Together, these three companies control 70–80% of the national market for fire trucks.[225]

165.    High market concentration increases the likelihood of collusion and other anticompetitive practices. When only a few companies dominate an industry, they can more easily monitor each other's behavior, coordinate territorial allocations and price increases, and maintain supracompetitive prices over time. The consolidation of the U.S. fire truck manufacturing industry among Manufacturer Defendants has eliminated meaningful competition and increased both the opportunity and incentive for collusion.

ii.        **Barriers to entry**

166.    Under basic economic principles, product prices above competitive levels would normally attract new entrants seeking to benefit from the supracompetitive pricing. But when there are entry barriers, new competitors are much less likely to enter the industry.

167.     Fire trucks require extensive infrastructure to build, including engineering expertise, supply chain management, and a specialized labor force. An entrant in this industry would require significant start-up capital to build and operate this infrastructure.

168.    In addition, fire trucks are often customized to meet the requirements and specifications of local fire departments. According to the U.S. Fire Administration, there are roughly 30,000 fire departments in the United States—68 percent operating a single station, 17 percent with two stations, and 15 percent with three or more—totaling about 52,000 fire stations

---

[225] Baker, Farrell & Kovaleski, *supra* note 69.

nationwide.[226] Each fire department—and in many cases, each individual station—maintains its own unique set of requirements.[227] And as REV Group's Fire Division president, Kent Tyler, noted, these are "fully custom trucks, and they don't just happen overnight."[228]

169.    Manufacturer Defendants have also established new barriers by entering into exclusive contracts with suppliers of critical inputs, such as steel, and government procurement platforms, which further undermines the ability of new manufacturers to enter the market.[229] REV Group also sells Spartan chassis to smaller manufacturers, affording it control over new entrants.

170.    These barriers and more prohibit new manufacturers from entering the market and competing against Manufacturer Defendants. As a result, Manufacturer Defendants' market positions are insulated against competition.

### iii.    Price inelasticity

171.    "Elasticity" refers to the sensitivity of demand and supply. For instance, a demand is inelastic if an increase in price would not result in a change in demand. Industries with inelastic demand, such as the fire truck manufacturing industry, are more susceptible to anticompetitive behavior.

---

[226] *National Fire Department Registry Quick Facts*, U.S. Fire Admin. (Sep. 26, 2025), https://apps.usfa.fema.gov/registry/summary last visited Nov. 19, 2025).

[227] *What a Competitive Strategy Analyst Thinks About the Fire Apparatus Industry*, Fuld & Co., https://www.fuld.com/what-a-competitive-strategy-analyst-thinks-about-the-fire-apparatus-industry (last visited Nov. 19, 2025).

[228] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, Fire Apparatus & Emergency Equipment (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands (last visited Nov. 19, 2025).

[229] *Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt., D.C. & Census of the S. Comm. on Homeland Sec. & Gov't Affs*, 119th Cong. (2025), https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/ (last visited Nov. 19, 2025).

172.    Demand for fire trucks is inelastic because they are necessary to provide critical, firefighting services. To protect lives and properties, municipalities and government agencies regularly require new fire trucks and/or replacement parts regardless of their prices. As Senator Andy Kim emphasized at a recent hearing, fire apparatus "is not equipment that small towns or even big cities can forego."[230] On average, fire departments need to buy new trucks every 10–15 years.[231]

173.    Buyers like Plaintiff are more vulnerable to collusion among the Defendants, who are able to raise prices without fearing lost sales or substitution.

## VI. Anticompetitive Effects Outweigh Procompetitive Benefits, If Any

### A.  Anticompetitive Effects

174.    Defendants' illegal agreements had the purpose and effect of raising, fixing, maintaining and/or stabilizing prices, reducing output, reducing innovation, and eliminating consumer choice.

175.    Plaintiff and Class members have suffered various damages and setbacks due to Defendants' anticompetitive scheme. In addition to paying supracompetitive prices for fire trucks, Plaintiff and Class members have been unable to timely repair or replace fire trucks, which reduced their abilities to respond to disasters and endangered firefighters and the communities they protect. Plaintiff and Class members have also been harmed because they had to divert funds from other essential needs towards purchasing fire trucks.

### i.    Plaintiff and Class members have been harmed by overpaying for fire trucks.

176.    Plaintiff and Class members have been harmed by fire truck prices inflated at a supracompetitive level due to Defendants' anticompetitive scheme.

---

[230] Ranking Member Kim's Written Opening Statement (Sept. 10, 2025), https://www.hsgac.senate.gov/wp-content/uploads/2025.09.10-Ranking-Member-Kim-Opening-Statement.pdf (last accessed Nov. 19, 2025).

[231] Baker, Farrell & Kovaleski, *supra* note 69.

177.    In public statements, Defendants have blamed inflation and supply issues for the rise in fire truck prices. But inflation does not adequately explain where the prices are currently. And as explained above, pandemic-related disruptions have since been largely resolved.

178.    Between 2015 and 2025, if the price of fire trucks had merely followed the general rate of inflation, a pumper truck would cost roughly $680,000 instead of $1 million, and a ladder truck would be about $1.2 million instead of $2 million.[232] This means municipalities nationwide are paying approximately 47% (or $320,000) more for pumper trucks and 66% (or $800,000) more for ladder trucks in 2025 than inflation alone would justify.

179.    Approximately 5,000 new fire trucks are sold annually in the United States,[233] with around 75% being pumpers.[234] Since 2016, purchasers, including Plaintiff and Class members, have spent an estimated $56.25 billion on new fire trucks, [235] which is about $19.8 billion more than what would be expected if prices had only risen in line with inflation.[236]

180.    Even allowing for temporary factors such as supply chain and labor shortages, the scale of these price increases far exceeds what would normally occur in a competitive market.

---

[232] Calculated assuming a pumper cost $500,000 and a ladder truck cost $900,000 in 2015.

[233] Jeffrey Bonior, *Get to Know Sutphen, Which Has Been Making Fire Engines in the United States Since 1890*, Sutphen (Mar. 12, 2021), https://www.sutphen.com/get-to-know-sutphen-which-has-been-making-fire-engines-in-the-united-states-since-1890 (last visited  Nov. 19, 2025).

[234] Alan M. Petrillo, *What's the Right Size Pump for Your Apparatus and How Does It Affect the Design?*, Fire Apparatus & Emergency Equipment (Sept. 27, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/pumpers/whats-the-right-size-pump-for-your-apparatus-and-how-does-it-affect-the-design (last visited Nov. 19, 2025).

[235] Calculated as ((3,750 pumper trucks per year * 9 years *$1 million) + (1,250 ladder trucks per year * 9 years * $2 million)).

[236] Cost based on inflation alone ($36.45 billion) calculated as ((3,750 pumper trucks per year * 9 years *$680,000) + (1,250 ladder trucks per year * 9 years * $1.2 million)).

ii.        **Plaintiff and Class members have been prevented from timely repairing and replacing vehicles in their fire truck fleets.**

181.    Plaintiff and Class members have been harmed because they were unable to retire and/or replace fire trucks in a timely and safe manner due to Defendants' anticompetitive scheme.

182.    Fire trucks naturally experience increasing mechanical failures and costly maintenance as they age. Industry guidance suggests that fire trucks should be moved to reserve status after 15 years of use and removed from service entirely after 20 to 25 years.

183.    However, sharp price increases and protracted delivery times driven by Defendants have made it difficult for municipalities such as Plaintiff to modernize their fleets. Many fire departments are forced to use trucks well past their service life because new ones are unaffordable.

184.    There are numerous examples of aging fleets and the concomitant hazards related to keeping trucks beyond their intended service life. As but one example, in January 2025, Chicago's fire department held a mock thirtieth birthday celebration for one of its engines, which was older than many of its firefighters.

185.    In Los Angeles, the fire department aims to keep 90% of its fleet ready for deployment, but recently it has managed only around 78% as older trucks require frequent repairs.[237] Rising costs for new vehicles have also forced the department to scale back on planned purchases.[238]

186.    In Atlanta, auditors discovered that over a third of the city's aging firefighting vehicles were out of service.[239] Fire departments in Houston and Seattle face similar

---

[237] Baker, Farrell & Kovaleski, *supra* note 69.

[238] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. Times (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Nov. 19, 2025).

[239] Baker, Farrell & Kovaleski, *supra* note 69.

challenges,[240] as do smaller municipalities in states such as Connecticut, Illinois, Michigan, New York, New Jersey, Pennsylvania, Texas, Kansas, and West Virginia.[241]

187.    For instance, in 2024, the city of Evanston, Illinois, had to negotiate with a regional Pierce Manufacturing dealer to purchase a demonstration model just to shorten the delivery time of a $2.3 million truck to roughly 12–14 months.[242] The new vehicle was needed to replace an 18-year-old reserve truck with serious mechanical issues that would have cost about $300,000 to repair.[243]

188.    In Ann Arbor, Michigan, the fire chief remarked that the price of fire trucks has become "bonkers," describing what appears to be "almost a monopoly market."[244] The city's next fire truck is projected to cost $2.4 million and take four years to arrive.[245]

189.    Similarly, the fire chief in Watertown, New York, explained that his department was so short on equipment that it resorted to buying a 20-year-old ladder truck from another

---

[240] Christy Grimes, *Houston Fire Department Navigating Supply Chain Hurdles with Fleet Replacements*, Gov't Fleet (Sept. 11, 2023), https://www.government-fleet.com/10206016/houston-fire-department-to-replace-aging-vehicles (last visited Nov. 19, 2025); David Kroman, *Seattle Firetruck Fleet Deteriorating Faster than Repairs Can Keep Up*, Seattle Times (Apr. 1, 2024), https://www.seattletimes.com/seattle-news/politics/seattle-fire-truck-fleet-deteriorating-faster-than-repairs-can-keep-up (last visited Nov. 14, 2025).

[241] *North Texas Fire Department in Crisis Needs Financial Windfall To Overcome Equipment Challenges*, CBS News (Jan. 23, 2025), https://www.cbsnews.com/texas/video/north-texas-fire-department-in-crisis-needs-financial-windfall-to-overcome-equipment-challenges (last visited Nov. 19, 2025); Allen Clayton, *City of Clarksburg Approves $3.1 Million to Purchase New Fire Trucks*, 12WBOY (Feb. 29, 2024), https://www.wboy.com/news/harrison/city-of-clarksburg-approves-3-1-million-to-purchase-new-fire-trucks (last visited Nov. 19, 2025); Musharbash, *supra* note 28; Baker, Farrell & Kovaleski, *supra* note 69.

[242] Bill Smith, *Council OK's Fire Truck Buy*, Evanston Now (Mar. 26, 2024), https://evanstonnow.com/council-oks-fire-truck-buy (last visited Nov. 19, 2025).

[243] *See id.*

[244] Ryan Stanton, *Ann Arbor Is Getting a New Fire Truck, But It Will Take 4 Years and Cost $2.4M*, mlive (Feb. 4, 2025), https://web.archive.org/web/20250205013142/https://www.mlive.com/news/ann-arbor/2025/02/ann-arbor-is-getting-a-new-fire-truck-but-it-will-take-4-years-and-cost-24m.html (last visited Nov. 19, 2025).

[245] *See id.*

city.[246]

### iii.     Plaintiff and Class members have been harmed by reduced abilities to respond to disasters.

190.     Plaintiff and Class members have suffered from reduced firefighting capabilities against natural disasters, which endangered firefighters as well as the communities they protect.

191.     Chad A. Russell, president of the Kansas State Association of Fire Chiefs, describes the impact of the fire truck shortage crisis caused by Defendants' conduct as follows:[247]

> This is not just a matter of dollars and cents—it is a public safety issue. When rigs are sidelined or unavailable, our ability to respond is compromised. Mutual aid systems strain, response times increase, and the safety of our citizens and firefighters is jeopardized.

192.     With natural disasters expected to increase in frequency and scale, communities across the country are at an elevated risk of fire emergencies but lack the necessary apparatus to respond to them.

193.     The devastating wildfires of Los Angeles in January 2025—where entire neighborhoods were destroyed and hundreds of lives were lost—is a tragic example.[248] When the fires broke out, the Los Angeles Fire Department had 183 fire trucks, of which more than 100

---

[246] Baker, Farrell & Kovaleski, *supra* note 69.

[247] *Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt, D.C. and Census of the S. Comm. on Homeland Sec. & Gov't Affs*, 119th Cong. (2025) (testimony of Dennis L. Rubin, Fire Chief, Kansas City Kansas Fire Dep't) at 11, https://www.hsgac.senate.gov/wp-content/uploads/Rubin-Testimony.pdf (last visited Nov. 19, 2025).

[248] Perkin Amalaraj, *Dozens of Fire Trucks Waiting for Repair while Fires Ravage LA*, Daily Mail (Jan. 14, 2025), https://www.msn.com/en-ae/news/other/dozens-of-fire-trucks-waiting-for-repair-while-fires-ravage-la/ar-BB1rr7vy (last visited Nov. 19, 2025); Jillian McKoy, *Death Count for 2025 LA County Wildfires Likely Hundreds Higher than Official Records Show*, (Jan. 10, 2025), https://www.bu.edu/sph/news/articles/2025/death-count-for-2025-la-county-wildfires-likely-hundreds-higher-than-official-records-show/ (last visited Nov. 19, 2025).

were out of service.[249] Due to this critical lack of safe, operative trucks, available firefighters were unable to deploy to the frontlines.[250]

194.    Kristin Crowley, Los Angeles' fire chief, acknowledged that the high number of out-of-service fire trucks impeded the department's ability to respond to the Palisades fire.[251] Had adequate vehicles been available, the resulting destruction—estimated at roughly about $350 million in damage to public property alone and not even accounting for injuries and deaths—could have been greatly reduced.

195.    Other cities have experienced similar problems. In Camden, New Jersey, Fire Chief Jesse M. Flax stated that delays in fire truck production and soaring prices were "creating greater risk for the public and firefighters."[252] During a 2024 house fire in which a resident died, one of Camden's trucks malfunctioned, causing its hose to lose pressure and slowing the response.[253] In Castle Rock, Colorado, firefighters were forced to respond to incidents in Type 3 brush trucks—vehicles designed for wildfires—because delivery of a new, more suitable apparatus had been delayed by four years.[254]

   iv.    **Plaintiff and Class members have been harmed because they have had to divert funds from other essential needs towards maintaining their fire truck fleets.**

196.    Escalating fire truck prices and long delays in receiving new vehicles have forced

---

[249] Ltr. from Am. Econ. L. Union to Pam Bondi, Att'y Gen., U.S. Dep't of Just., Andrew Ferguson, Chair, Fed. T. Comm'n at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Nov. 19, 2025).

[250] Baker, Farrell & Kovaleski, *supra* note 69.

[251] *Id.*

[252] Baker, Farrell & Kovaleski, *supra* note 69.

[253] *See id.*

[254] Isabelle Crow, IAFF Spotlight Apparatus Crisis and Its Impact, Fire & Safety Journal Americas (June 20, 2025) https://fireandsafetyjournalamericas.com/iaff-spotlight-apparatus-crisis-and-its-impact (last visited Nov. 19, 2025).

Plaintiff and Class members to shift critical funds toward purchasing and repairing fire trucks.[255]

197.    For example, municipalities such as Spokane, Washington and Mills, Wyoming, have been required to cut essential training and, in some cases, lay off firefighters due to severe budget constraints.[256]

### B.  Absence of Procompetitive Benefits

198.    Defendants cannot demonstrate cognizable efficiencies that would be sufficient to rebut the presumption that the conduct alleged substantially lessened competition in the relevant market.

199.    Defendants cannot demonstrate procompetitive benefits of the conduct alleged that could not have been achieved through alternative means that would have been less restrictive on competition than the conduct alleged.

200.    Defendants cannot demonstrate that entry into the relevant market by new competitors or expansion by existing competitors would be timely, likely, or sufficient to offset the anticompetitive effects of the conduct alleged.

201.    Defendants' unlawful conduct eliminated competition in the relevant market and deprived Plaintiff and the Class of the benefits of free and unrestrained competition that the antitrust laws were designed to ensure.

### VII.    Harm to Competition and Antitrust Injury

202.    Defendants' conduct produced significant anticompetitive effects in the relevant market, including without limitation:

1.  The restraint and elimination of open price competition;

2.  The artificial inflation, stabilization, or maintenance of fire truck prices at

---

[255] Musharbash, *supra* note 28.

[256] Ltr. from Am. Econ. L. Union to Pam Bondi, Att'y Gen., U.S. Dep't of Just., Andrew Ferguson, Chair, Fed. T. Comm'n at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Nov. 19, 2025).

supracompetitive levels;

3. The removal of independent market rivals; and

4. The overcharging of Plaintiff and Class members for fire trucks, resulting in
substantial financial injury.

203.    Defendants' collusive scheme was designed to and did raise and maintain fire
truck prices at levels well above those that would have prevailed in a competitive market. As a
direct and foreseeable consequence, Plaintiff and Class members paid inflated, supracompetitive
prices for fire trucks throughout the Class Period.

204.    The harm suffered by Plaintiff and Class members constitutes the type of injury
that the antitrust laws are intended to prevent. In the absence of Defendants' unlawful agreement
and coordinated conduct, Plaintiff and Class members would have paid substantially lower prices
for fire trucks.

## VIII.    Fraudulent Concealment and Continuing Violations

205.    During the Class Period, Defendants effectively, affirmatively, and fraudulently
concealed their unlawful agreement and conspiracy from Plaintiff and class members. Plaintiff
did not learn—and could not have learned through reasonable diligence—of the existence of the
conspiracy until shortly before filing this Complaint. Defendants engaged in a secret conspiracy
to fix the price of fire trucks that was structured to avoid detection, leaving Plaintiff without
actual or constructive knowledge of Defendants' price-fixing scheme.

206.    Defendants concealed their conduct through multiple methods, including
confidential meetings and secret communications. Defendants exchanged competitively sensitive
data through FAMA's "members' only" reports, which are intentionally withheld from public
view and inaccessible to fire apparatus customers like Plaintiff. Indeed, FAMA's "give-data-to-
get-data" policy further ensured that only participating FAMA members—those who contributed
their own data—had access to these reports.

207.    Defendants also used FAMA's semiannual, members-only meetings and events as

opportunities to meet in person and share information privately, thus avoiding the creation of written records. Because neither the FAMA reports nor these closed meetings were available or open to the public, Plaintiff had no reason to suspect the existence of Defendants' unlawful anticompetitive scheme.

208.    Defendants' conspiracy was inherently self-concealing, as their conduct was intended to prevent discovery as such conduct violates the antitrust laws. The unlawful conduct alleged was only revealed through the investigative reporting by Basel Musharbash[257] and the New York Times,[258] as well as inquiries from the U.S. Senate.[259] Thus, Plaintiff reasonably believed the industry to operate under competitive market conditions.

209.    On information and belief, each Defendant publicly represents that it complies with federal antitrust laws, even those laws that prohibit the collusive conduct alleged herein.

210.    For example, REV Group states that:
> We are also subject to federal, state and foreign consumer protection and unfair trade practice laws and regulations . . . . In addition, certain laws and regulations affect other areas of our operations, including, . . . anti-competitive conduct . . . . We have instituted various and comprehensive policies and procedures designed to ensure compliance. . . .[260]

211.    Similarly, FAMA's Code of Ethics requires all FAMA members, including Manufacturer Defendants, to:

---

[257] Musharbash, *supra* note 28.

[258] Baker, Farrell & Kovaleski, *supra* note 69.

[259] Press Release, Sen. Jim Banks, *Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing* (Apr. 15, 2025), https://www.banks.senate.gov/news/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing/ (last visited Nov. 19, 2025); Press Release, Sen. Josh Hawley, *Hawley, Kim Demand Answers from Major Companies after Backlog, Soaring Prices Hamper Fire Department Readiness* (Apr. 3, 2025), https://www.hawley.senate.gov/hawley-kim-demand-answers-from-major-companies-after-backlog-soaring-prices-hamper-fire-department-readiness/ (last visited Nov. 19, 2025).

[260] REV Group 10-K, 2023 (available at https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2023.pdf) (last visited Nov. 19, 2025).

> Be aware of and obey all anti-trust trade regulation laws which prohibit actions that restrain competition. As an example, you may not cooperate with competitors to fix or stabilize prices, divide up clients or markets, boycott competitors, or discuss the possibility of these activities with competitors.[261]

212.    No information in the public domain was available to Plaintiff and the Class members that would suggest that the Defendants were conspiring with each other. A reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Manufacturer Defendants' fire truck prices before these recent events.

213.    Because Defendants fraudulently concealed their unlawful conduct, the statute of limitations on Plaintiffs' arising from the conspiracy alleged herein has been tolled and suspended.

214.    In addition, Defendants engaged in continuing overt acts that restarted the statute of limitations with each occurrence. Throughout the Class Period, Manufacturer Defendants repeatedly fixed prices, exchanged confidential information, and sold fire trucks to Plaintiff and Class members at unlawfully inflated prices.

215.    Defendants' overt acts were new, independent acts that perpetuated and adapted their unlawful scheme to current market conditions. They were not mere reaffirmations of Defendants' prior conduct. By continuously renewing and refining their unlawful scheme, Defendants caused ongoing and cumulative harm to Plaintiff and Class members.

216.    Each sale of fire apparatus to Plaintiff restarted the statutory period, regardless of whether Plaintiff was aware of earlier violations. Every sale of a fire truck at a supracompetitive price constitutes a distinct cause of action for purposes of the statute of limitations.

## CAUSES OF ACTION

### COUNT ONE

**Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
(Against All Defendants)**

217.    Plaintiff hereby repeats and incorporates by reference paragraphs 1 through 216 as

---

[261] *Code of Ethics*, Fire Apparatus Mfrs. Ass'n, https://www.fama.org/code-of-ethics/ (last visited Nov. 19, 2025).

though fully set forth herein.

218.    Defendants entered into and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by artificially reducing or eliminating competition with respect to the sale, marketing, and distribution of fire trucks sold directly to purchasers in the United States.

219.    In particular, Defendants have contracted, combined, and conspired to (1) restrict the output of fire trucks in the United States and (2) raise, fix, maintain, and/or stabilize the prices of fire trucks sold directly to purchasers in the United States; and (3) share competitively sensitive confidential information that enable coordinated non-competitive conduct on pricing and output.

220.    The relevant product market is the market for fire trucks and the geographic market is the United States.

221.    Defendants' anticompetitive and unlawful conduct is per se illegal.

222.    In the alternative, Defendants' conduct was anticompetitive and unlawful under the rule of reason.

223.    Manufacturer Defendants possess market power in the relevant market. The market for fire trucks is highly concentrated, with Manufacturer Defendants controlling 70–80% of the relevant market. Manufacturer Defendants' collective market power includes the power to artificially deflate the number of fire trucks produced in the United States below competitive levels and to artificially inflate the price of fire trucks above competitive levels.

224.    Defendants could impose an increase in the price of fire trucks collectively without causing consumers to switch their purchases to another product or decline to purchase fire trucks. Fire trucks are essential to municipalities, fire departments, and other purchasers across the United States. The demand for fire trucks is inelastic. There are also significant barriers to entry so new entrants are very unlikely in the face of rising prices and growing backlogs.

225.    Each Manufacturer Defendant regularly exchanged comprehensive, timely, competitively sensitive, non-public information about their operations. They also regularly

participated in meetings and conversations to eliminate competition from the market. Given the significant market shares of Manufacturer Defendants as well as their continuous coordination, any anonymization of data was ineffective in preventing each competitor's understanding of the others' trends.

226.    Manufacturer Defendants use the sensitive economic data FAMA shares with them to coordinate price increases and suppress production. They also use FAMA to monitor their co-conspirators to ensure continued adherence to the conspiracy.

227.    Each Manufacturer Defendant exchanged this data with the understanding that it would be reciprocated by the others. FAMA enforced this understanding by requiring Defendants to share data in order to receive comparable data.

228.    When businesses that are competing for the same consumers exchange competitive information, it reduces the incentives to compete. Accordingly, Defendants used the data obtained through FAMA to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the fire truck market. This strategic information was a material factor in Manufacturer Defendants' decisions to restrict supply and inflate the prices that Plaintiff and Class members paid for fire trucks during the class period.

229.    Defendants' agreement has had the effect of reducing and suppressing competition among Manufacturer Defendants in the market for fire trucks, inflating the prices of fire trucks, and restricting the supply of fire trucks across the United States..

230.    Defendants' unlawful agreement was not reasonably necessary to further any procompetitive purpose.

231.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for fire trucks throughout the United States.

232.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members were injured in their business or property.

233.    This offense is likely to continue unless injunctive relief is granted.

234.    Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged in this Complaint.

## COUNT TWO

**Restraint of Trade in Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18
(against the AIP Defendants, REV Group, and Oshkosh)**

235.    Plaintiff hereby repeats and incorporates by reference paragraphs 1 through 234 as though fully set forth herein.

236.    Defendants unlawful conduct, as described above, substantially lessened competition in the market for fire trucks in the United States. [262]

237.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class members were injured in their business or property.

238.    This offense is likely to continue unless injunctive relief is granted.

239.    Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged in this Complaint.

## COUNT THREE

**Declaratory and Injunctive Relief for Violations of Section 1 of the Sherman Act, 15 U.S.C.
§ 1 and Section 7 of the Clayton Act, 15 U.S.C. § 18
(against All Defendants)**

240.    Plaintiff hereby repeats and incorporates by reference paragraphs 1 through 234 as though fully set forth herein.

241.    Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

242.    Plaintiff's allegations described herein constitute violations of Section 1of the

---

[262] "A company's history of expansion through mergers presents a different economic picture than a history of expansion through unilateral growth. Internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output. It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers that added to concentration in an industry." *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962).

Sherman Act and Section 7 of the Clayton Act.

243.    Defendants effectuated a scheme to restrain trade and substantially lessen competition in the United States market for fire trucks.

244.    There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' conduct that outweighs its harmful effect.

245.    As a direct and proximate result of Defendants' anticompetitive scheme, as alleged herein, Plaintiff and the Class were harmed.

246.    The purpose and effect of the scheme was to prevent or delay competition in order to charge supracompetitive prices for fire trucks without a substantial loss of sales.

247.    The anticompetitive agreements alleged herein should be declared invalid and unenforceable.

248.    Plaintiff and the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count. Their injury includes paying higher prices for fire trucks than they would have paid in the absence of those violations. These injuries will continue unless halted.

249.    Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a Declaratory Judgment that Defendants' conduct constitutes a violation of § 1 of the Sherman Act.

250.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff requests that the Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

251.    This action may proceed as a class action, with Plaintiff serving as a Class Representative and with Plaintiffs' counsel as Class Counsel;

252. Defendants have contracted, combined, and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

253. Defendants have combined in a way that substantially lessened competition or tended to create a monopoly in the market for fire trucks in the United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and that Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

254. Plaintiff and the Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15 and Section 7 of the Clayton Act, 15 U.S.C. § 18;

255. Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

256. Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

      a. A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants; and

      b. Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from continuing and maintaining the conspiracy or agreements alleged herein.

257. Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class.

258.    Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law.

259.    Plaintiff and the Class receive such other or further relief as may be just and proper.

### JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

SIGNATURE PAGE FOLLOWS

Dated:  November 19, 2025                    Respectfully Submitted,


By:  _____/s/ Christian Uehlein_____
                    CHRISTIAN UEHLEIN


**THORNTON LAW FIRM LLP**
Christian Uehlein, BBO# 667325
David C. Strouss, BBO# 546253
Michael A. Lesser, BBO#631128
Brian J. Freer, BBO# 683030
84 State Street, 4th Floor
Boston, MA 02109
Telephone: (617) 720-1333
dstrouss@tenlaw.com
mlessser@tenlaw.com
cuehlein@tenlaw.com
bfreer@tenlaw.com

**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri (CA State Bar No. 130064)
(*pro hac vice* application forthcoming)
David Seidel (CA State Bar No 307135)
(*pro hac vice* application forthcoming)
Cadio Zirpoli (CA State Bar No. 179108)
(*pro hac vice* application forthcoming)
Ronnie Spiegel (WA State Bar No. 33721)
(*pro hac vice* application forthcoming)
jsaveri@saverilawfirm.com
dseidel@saverilawfirm.com
czirpoli@saverilawfirm.com
rspiegel@saverilawfirm.com
601 California Street, Suite 1505
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940

**KOZYAK TROPIN &
THROCKMORTON LLP**
Benjamin J. Widlanski (FL Bar No. 1010644)
bwidlanski@kttlaw.com
(*pro hac vice* application forthcoming)
Gail A. McQuilkin (FL Bar No. 969338)
gam@kttlaw.com
(*pro hac vice* application forthcoming)
Brandon Sadowsky (FL Bar No. 1052643)
bsadowsky@kttlaw.com
(*pro hac vice* application forthcoming)
2525 Ponce de Leon Boulevard, 9th Floor
Miami, FL 33134
(305) 372-1800

**LEEDS BROWN LAW, P.C.**
Jeffrey K. Brown, Esq
(*pro hac vice* application forthcoming)
Michael A. Tompkins, Esq.
(*pro hac vice* application forthcoming)
Brett R. Cohen, Esq.
(*pro hac vice* application forthcoming)
1 Old Country Road
Suite 347
Carle Place, NY 11514
(516) 873-9550

*Attorneys for Plaintiff*